# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

FRANCISCO S. PARDO *vs.* THE GENERAL HOSPITAL
CORPORATION[1] & another.[2]

Middlesex. October 3, 2005. - January 26, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Anti-Discrimination Law,* Sex. *Employment,* Retaliation. *Practice, Civil,* Discovery, Instructions to jury. *Privileged Communication. Doctor,* Employment. *Hospital,* Peer review, Appointment to staff. *Evidence,* Hearsay, State of mind.

In a civil action alleging that the defendant hospital discriminated against the plaintiff, a doctor employed at the hospital, on the basis of his sexual orientation, the judge correctly denied the plaintiff's request for discovery of certain privileged medical peer review documents, where the plaintiff failed to establish that a member of the medical peer review committee had not acted in good faith in connection with his or her activities as a member of the committee. [8-17]

---

[1]Doing business as Massachusetts General Hospital.

[2]Partners HealthCare System, Inc.

In a civil action alleging that the defendant hospital discriminated against the plaintiff, a doctor employed at the hospital, on the basis of his sexual orientation, the judge did not abuse her discretion in admitting in evidence certain documents and testimony concerning their contents, where the documents demonstrated notice and knowledge on the part of a supervising doctor within the hospital, and where the documents and related testimony were admissible under the state of mind exception to the hearsay rule as pertaining directly to the hospital's lawful, nondiscriminatory reasons for its employment decisions concerning the plaintiff. [17-19]

In a civil action alleging that the defendant hospital discriminated against the plaintiff, a doctor employed at the hospital, on the basis of his sexual orientation and retaliated against him when he complained about the discrimination, the judge did not abuse her discretion in declining a request to instruct the jury that the nearness in time between protected activity and adverse action would permit an inference of retaliation, where there was sharply conflicting evidence regarding the sequence and timing of events, where the plaintiff was not precluded from arguing retaliation in his closing argument, and where the judge instructed the jury about their role in determining the credibility of witnesses and the inferences that the jury might draw from circumstantial evidence on both the discrimination and retaliation claims [19-21]; moreover, in responding to a jury question about an element of the retaliation claim, the judge properly determined that the jury should decide whether, in this particular case, the plaintiff's filing of a charge with the Massachusetts Commission Against Discrimination was reasonable [21-23].

CIVIL ACTION commenced in the Superior Court Department on May 4, 1998.

A motion to compel discovery was heard by *Wendie I. Gershengorn*, J., and the case was tried before her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Ellen J. Zucker* (*Paul R. Cirel* with her) for the plaintiff.

*Frank E. Reardon* (*James J. Horgan* with him) for the defendants.

MARSHALL, C.J. The plaintiff, Dr. Francisco S. Pardo, a radiation oncologist, appeals from a jury verdict in favor of the defendants, The General Hospital Corporation and Partners HealthCare System, Inc. (collectively the hospital), his former employer, on claims that he was discriminated against on the basis of his sexual orientation and that the hospital retaliated against him when he complained about the discrimination. See G. L. c. 151B, § 4 (1), (4), and (4A). At issue is whether the

judge[3] erred in (1) denying the plaintiff discovery of certain documents the hospital claimed were privileged under G. L. c. 111, § 204, the medical peer review privilege[4]; (2) admitting in evidence certain documents that the plaintiff contends were inadmissible because they contained hearsay statements, and permitting testimony concerning them; and (3) instructing the jury on his retaliation claim. We transferred the case here on our own motion. For the reasons we discuss below, we affirm the judgment.

1. *Background.* We summarize the facts as the jury could have found them, see *Mitchell* v. *Silverstein*, 320 Mass. 524, 525 (1946), identifying conflicting evidence where relevant.

Briefly stated, the plaintiff alleged that his career was derailed after he revealed his homosexuality to Dr. Herman D. Suit, at all relevant times chief of the hospital's department of radiation oncology (department). The hospital countered with evidence that Dr. Suit had supported the advancement of the plaintiff's career after the disclosure, as well as evidence that the department in general and Dr. Suit in particular had a history of recruiting, employing, and supporting homosexual employees.[5]

---

[3]The judge in the Superior Court was assigned to handle all phases of the case, including all discovery matters and the trial.

[4]General Laws c. 111, § 204 (*a*), provides in pertinent part:

"Except as otherwise provided in this section, the proceedings, reports and records of a medical peer review committee shall be confidential . . . [and] shall not be subject to subpoena or discovery, or introduced into evidence, in any judicial or administrative proceeding, . . . and no person who was in attendance at a meeting of a medical peer review committee shall be permitted or required to testify in any such judicial or administrative proceeding . . . ."

" 'Medical peer review committee' is defined in G. L. c. 111, § 1, as 'a committee of a state or local professional society of health care providers . . . or of a medical staff of a public hospital or licensed hospital . . . which committee has as its function the evaluation or improvement of the quality of health care rendered by providers of health care services, the determination whether health care services were performed in compliance with the applicable standards of care . . . [or] the determination of whether a health care provider's actions call into question such health care provider's fitness to provide health care services . . . .' "

[5]For example, a doctor once employed in the department testified that he

The hospital also proffered substantial evidence of the plaintiff's neglect in the performance of his duties and other substandard behavior. We describe the evidence in greater detail because it informs in particular our discussion of the medical peer review privilege.

In 1986 the plaintiff joined the department, beginning a three-year residency. Dividing his time between clinical and laboratory work, the plaintiff successfully completed his residency in 1989, receiving an award for excellence. Dr. Suit invited the plaintiff to remain on staff as a fellow for one year, during which time the plaintiff, with the support of Dr. Suit, received several competitive grants for research. In 1990, Dr. Suit recommended that the plaintiff join the medical staff of the department and be appointed an instructor at Harvard Medical School. Within two years the plaintiff had published several articles in academic publications. Dr. Suit agreed to increase the amount of clinical work undertaken by the plaintiff.

During his residency and fellowship years, the plaintiff did not disclose his sexual orientation to Dr. Suit or to other senior members of the hospital staff. In the spring of 1993, the plaintiff learned that his longtime partner was ill with acquired immune deficiency syndrome (AIDS). In October, 1993, the plaintiff informed Dr. Suit that he is "gay," that his partner had AIDS, and that he might need to take some time off to care for his partner.

After this discussion, the plaintiff continued to advance in his career and Dr. Suit continued to support him. In the summer of 1994, Dr. Suit recommended the plaintiff for promotions at the hospital and at Harvard Medical School. Dr. Suit also recommended the plaintiff for further grant funding for his research.[6]

had been recruited by Dr. Suit, who was aware that the doctor is homosexual, and that his sexual orientation had never been an issue during his employment. A secretary who had been openly homosexual for twenty-three of the twenty-four years he had worked in the department testified that he encountered no homophobic behavior in the department. Dr. Suit testified that another homosexual employee who suffered from acquired immune deficiency syndrome (AIDS) was supported and had worked in the department until his death.

[6]Dr. Suit described a letter he wrote in support of the plaintiff's grant application as "a very positive, enthusiastic recommendation."

The promotion at the hospital was approved, and the plaintiff received the funding for his research from the National Cancer Institute. Dr. Suit continued to provide the plaintiff with salary support and additional office space to facilitate his work.

Sometime thereafter difficulties arose between Dr. Suit and the plaintiff. The jury learned that, in January, 1995, Dr. Suit reprimanded the plaintiff for removing certain laboratory research data books from Dr. Suit's laboratory[7]; he ordered the plaintiff not to enter the laboratory without his permission. In March, 1995, Dr. Suit informed the plaintiff that he was placing his academic promotion on hold.[8] Shortly thereafter, Dr. Suit became concerned about the plaintiff's clinical teaching and patient care activities for the reasons we next discuss.

In April, 1995, Dr. Alan Hartford, a medical resident in the department, submitted a five-page memorandum to Dr. Suit (Hartford memorandum), in which he detailed numerous incidents over the course of the preceding three months to the effect that the plaintiff had not provided adequate supervision and training of residents.[9] After receiving the Hartford memorandum, Dr. Suit spoke with Dr. Allan Thornton, who took care of the plaintiff's patients in his absence and who therefore interacted with some of the medical residents who worked with the plaintiff. In response, Dr. Thornton wrote a

[7]The plaintiff testified that he was authorized to review the data books, that the laboratory books did not belong to any particular researcher, and that he removed the books from the laboratory only to review them in a quieter office space elsewhere. Dr. Suit testified that the books belonged to another researcher, and that it was against departmental policy to "violate another person's research data book."

[8]The plaintiff testified that, shortly thereafter, he told Dr. Suit that he was concerned that he was not being "treated appropriately," and that he was planning to pursue his rights "as a gay male in the workplace." Dr. Suit denied that he was aware of the plaintiff's concerns about discrimination based on his sexual orientation, but testified that he was aware that the plaintiff was considering retaining an attorney but did not know for what purpose.

[9]Dr. Hartford first initiated a discussion with Dr. Suit about his concerns. Dr. Suit suggested that Dr. Hartford put his concerns in writing if he felt "strongly" about them.

Dr. Hartford wrote (and read to the jury at trial), "Pages were left unanswered. Responses to questions were vague and not informative. Often [the plaintiff] would refuse to respond to telephone calls from patients and refer them to me, even if I had never met the patient and knew nothing about the patient's past history with [the plaintiff]."

detailed letter (Thornton letter) discussing various shortcomings of the plaintiff. Dr. Thornton noted numerous areas of concern including "[p]age availability," describing the plaintiff as "difficult to reach either by page or telephone"; "[c]linic accessibility," describing the plaintiff's repeated unavailability at the department's clinic, creating particular difficulties for new patients; the plaintiff's repeated failure to comply with certain protocols, which Dr. Thornton described as "an embarrassment to our group," which could "not continue"; "[r]ecord keeping," in which Dr. Thornton said he "rarely [found] any notation in the charts of [the plaintiff's] patients by [the plaintiff] himself," even though these were "extremely ill patients requiring careful monitoring"; and the plaintiff's history of obtaining "inadequate and spurious" consents by patients, which, said Dr. Thornton, would negatively affect any "litigation." Dr. Thornton also described with concern that patient care was "left to the resident" and that the plaintiff was "rarely in attendance" at departmental conferences.

In late May, 1995, Dr. Suit informed the plaintiff that he was removing him from teaching and supervising residents, and would cease assigning residents to the plaintiff effective July 1, 1995.[10] Further reductions in the plaintiff's privileges and responsibilities followed. Dr. Suit met with the executive committee of the department in late June, 1995.[11] The committee concluded it would no longer commit to funding the plaintiff's salary for his research beyond the next two years. In August, 1995, Dr. Suit removed the plaintiff from participating in an experimental radiation project because, as he testified, the plaintiff had failed to follow certain procedures concerning the use of an experimental machine to irradiate brain tumors.

On August 17, 1995, the plaintiff filed a complaint with the

---

[10]Dr. John Munzenrider, who then served as director of residency training at the hospital, testified that Dr. Suit did not consult him regarding the decision to relieve the plaintiff of his teaching duties and that, in his view, the plaintiff was a good teacher of residents.

[11]There is no evidence describing the composition or function of the executive committee of the department of radiation oncology (department). Presumably it is different from the general executive committee (GEC), which is a hospital-wide committee. See note 12, *infra.*

Massachusetts Commission Against Discrimination (MCAD). The following month, a dispute arose in the department concerning the plaintiff's choice of treatment for one of his patients. While the plaintiff was on vacation, Dr. Suit and the department's clinical director changed the treatment plan ordered by the plaintiff. The clinical director and the plaintiff later disagreed over how the change had been handled. Dr. Suit recommended that the plaintiff discuss the matter with the hospital's chief medical officer, Dr. Peter Slavin. Based on a discussion with Dr. Slavin in late November, 1995, Dr. Suit came to believe that the plaintiff had lied about approvals he claimed to have secured before he had chosen the treatment plan. There was other evidence of what the hospital characterizes as the plaintiff's "truthfulness, clinical judgment and interpersonal interactions" that ultimately resulted in Dr. Suit's recommendation that the plaintiff's clinical privileges be limited.

Dr. Suit testified that in light of his escalating concerns, in December, 1995, he recommended that the plaintiff's reappointment to the medical staff be limited to six months, and that his clinical work be supervised. The hospital's general executive committee (GEC) considered Dr. Suit's recommendation in January, 1996,[12] and voted unanimously to recommend that the plaintiff be reappointed for a six-month period without clinical privileges.[13] The hospital's board of trustees (board) adopted the recommendation on January 19, 1996. The plaintiff appealed from the decision to a staff review committee.[14] In June, 1996,

---

[12]The GEC acts as an advisory body to the chief executive officer and the trustees of the hospital. According to the hospital bylaws, among other duties, the GEC "consider[s] and recommend[s] to the Trustees appointments and other actions relative to the Professional Staff." The hospital bylaws designate the GEC as a "medical peer review committee."

[13]Although the hospital bylaws provide the GEC with the option of doing so, the GEC did not invite the plaintiff to appear before it to address the concerns raised by Dr. Suit.

[14]The hospital bylaws provide that on receipt of an aggrieved staff member's written request for a hearing, the chief executive officer submits the request to the GEC, which appoints a staff review committee. The staff review committee consists of five staff members, two of whom have the same rank as the aggrieved staff member and none of whom has been "actively involved in formulating the recommendation upon which the Trustees have acted."

when his temporary reappointment expired, the plaintiff's employment was terminated.

In February, 1998, after a hearing, the staff review committee recommended that the board reverse its decision with respect to the plaintiff's clinical privileges. The staff review committee upheld the board's decision denying the plaintiff's application for reappointment in July, 1996. The board restored the plaintiff's clinical privileges nunc pro tunc for the period January to June, 1996. The plaintiff filed suit against the hospital and others[15] in May, 1998.

2. *The medical peer review privilege.* The plaintiff challenges the judge's pretrial order denying his request for the discovery of certain documents the hospital claimed were privileged under the medical peer review statute, G. L. c. 111, § 204 (*a*), because, he asserts, his allegations of "bad faith" on the part of Dr. Suit, Dr. Slavin, and the clinical director triggered the statutory exception to the privilege. The exception permits discovery of medical peer review materials where a committee member did not act "in good faith" and "in the reasonable belief" that his actions were warranted. See G. L. c. 111, § 204 (*b*).[16] See also G. L. c. 111, § 203 (*c*).[17] The judge properly resolved the question in favor of the hospital.

---

[15]In May, 2002, by stipulation of dismissal, the plaintiff dismissed all claims against the remaining defendants, waiving all rights of appeal.

[16]General Laws c. 111, § 204 (*b*), provides in pertinent part: "[T]he proceedings, reports, findings and records of a medical peer review committee [shall not] be immune from subpoena, discovery or use as evidence in any proceeding against a member of such committee to establish a cause of action pursuant to [G. L. c. 231, § 85N]."

General Laws c. 231, § 85N, in turn, provides: "No member of a professional society or of a duly appointed committee thereof, or a duly appointed member of a committee of a medical staff of a licensed hospital . . . shall be liable in a suit for damages as a result of his acts, omissions or proceedings undertaken or performed within the scope of his duties as such a committee member, provided that he acts in good faith and in the reasonable belief that based on all of the facts the action or inaction on his part was warranted . . . ."

[17]General Laws c. 111, § 203 (*c*), provides: "An individual or institution . . . providing information, opinion, counsel or services to a medical peer review committee . . . shall not be liable in a suit for damages by reason of having furnished such information, opinion, counsel or services or by reason

In a discrimination action alleging disparate treatment, obtaining comparative information about an employer's treatment of similarly situated employees is often critical to the plaintiff's case. See, e.g., *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129 (1997), citing *Smith College* v. *Massachusetts Comm'n Against Discrimination*, 376 Mass. 221, 228 (1978) ("The most probative means of establishing that the plaintiff's termination was a pretext for . . . discrimination is to demonstrate that similarly situated . . . employees were treated differently"). Here, the plaintiff requested "all documents" relating to patient care deficiencies by other members of the department's medical staff and the discipline of such staff,[18] as well as "[a]ll documents" relating to other physicians denied clinical and research privileges or reappointment "from 1986 to the present." In response to the hospital's invocation of the medical peer review privilege, the plaintiff cited the statutory exception to the privilege, arguing that the privilege yielded to any allegation of "bad faith," in particular, any allegation of discriminatory conduct. After multiple submissions by the parties concerning the plaintiff's motion to compel, which the judge addressed with admirable attention to detail, see *Carr* v. *Howard*, 426 Mass 514, 529 (1998), she ordered the hospital to produce a significant amount of the requested information,[19] but denied the plaintiff's motion to the extent it requested docu-

of such participation, provided, that such individual or institution acted in good faith and with a reasonable belief that said actions were warranted in connection with or in furtherance of the function of said committee or the procedures required by this section."

[18]Specifically, the plaintiff requested "[a]ll documents relating to deficiencies in patient care concerning members of the [department], dating from 1986 to the present, including, but not limited to patient complaints, utilization review data and quality assessment committee reports and/or data, internal audits, internal incident reports, major incident reports to the Board of Registration in Medicine, as well as reports from internal review committees' investigations, memoranda, reports from [hospital] committees and notes kept by members of the [d]epartment and/or [hospital] administrators, including but not limited to all complaints made by and notes regarding such complaints" taken by the three physicians.

[19]Among other discovery orders, in July, 2000, the judge ordered the hospital to submit a "peer review privilege log" listing "all documents relating to comparative data relating to patient care deficiencies, denial and/or

ments she concluded were covered by the medical peer review privilege.[20]

The judge was correct to rule as she did. The Legislature has mandated that the medical profession regulate the quality of patient care by identifying and remedying instances of substandard care at least in part through internal medical peer review proceedings. See, e.g., G. L. c. 111, § 203 (*a*), (*d*).[21] See also *Carr* v. *Howard, supra* at 517-518 (discussing history and purpose of medical peer review process). To that end, the Legislature enacted the medical peer review privilege, insulating from discovery certain material submitted to or produced by

discontinuing of privileges and/or employment inquiries made regarding [the plaintiff] withheld from production on the basis of an asserted peer review privilege." In October, 2000, she ordered the hospital to produce comparative promotional files for other candidates considered for academic positions at Harvard Medical School, ruling that these documents were not covered by the medical peer review privilege. In July, 2001, the judge ordered the hospital to produce the transcript and certain other records of the staff review committee, see note 14, *supra*, concluding that the staff review committee was not a "medical peer review committee" within the meaning of G. L. c. 111, § 1. See generally G. L. c. 111, § 204 (*b*) ("Documents, incident reports or records otherwise available from original sources shall not be immune from subpoena, discovery or use in any such judicial or administrative proceeding . . .").

[20]The judge ordered the hospital to produce three documents referenced in the hospital's medical peer review privilege log, as well as all residency teaching evaluations of medical staff members from 1990 to 1996. Although her ruling did not contain a detailed analysis of the medical peer review privilege's application to each document listed in the log, it is clear that her decision not to order production of the remaining documents rested on G. L. c. 111, § 204 (*a*).

On appeal, the plaintiff's argument focuses solely on whether the medical peer review privilege should have yielded to the statutory exception. He does not challenge the judge's implicit ruling that the remaining 190 documents listed in the hospital's peer review privilege log fell within the scope of the privilege. Any claim to that effect is therefore waived; we do not consider it.

[21]General Laws c. 111, § 203 (*a*), provides: "The by-laws of every licensed or public hospital and the by-laws of all medical staffs shall contain provisions for reporting conduct by a health care provider that indicates incompetency in his specialty or conduct that might be inconsistent with or harmful to good patient care or safety."

General Laws c. 111, § 203 (*d*), provides: "Every licensed hospital, as a condition of licensure, and every public hospital shall be required to participate in risk management programs established by the board of registration in medicine pursuant to [G. L. c. 112, § 5] . . . ."

a medical peer review committee, G. L. c. 111, §§ 203-204, inserted by St. 1986, c. 351, § 9, a privilege not recognized at common law. See *Cronin* v. *Strayer, supra* at 535 (common-law privilege not recognized for records of impaired physician committee of Massachusetts Medical Society). The obvious purpose of the statutory medical peer review privilege is to "promote candor and confidentiality" in the peer review process, *Carr* v. *Howard, supra* at 518, and "to foster aggressive critiquing of medical care by the provider's peers," *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med.,* 401 Mass. 172, 182 (1987). See *Ayash* v. *Dana-Farber Cancer Inst.,* 443 Mass. 367, 396 (2005) ("Physicians would be far less willing candidly to report, testify about, and investigate concerns of patient safety if their actions would be subject to later scrutiny and possible litigation").

The Legislature provided a single, narrow exception to the privilege "to establish" that a member of a peer review committee did not act "in good faith and in the reasonable belief that based on all of the facts the action or inaction on his part was warranted" during the peer review process. See G. L. c. 111, § 204 (*b*); G. L. c. 231, § 85N.[22] Neither the language of the statute nor its legislative history elucidates the precise boundaries the Legislature sought to establish when abrogating the immunity from discovery in certain cases. Taking into account the compelling public policy the privilege was established to advance, we conclude that the privilege can only be invaded on some threshold showing that a member of a medical peer review committee did not act in good faith in connection with his activities as a member of the committee, for example did not provide the medical peer review committee with a full and honest disclosure of all of the relevant circumstances, but sought

[22]The exemption of immunity from liability, and attendant medical peer review privilege extends to "any proceeding against a member of [a peer review] committee to establish a cause of action." G. L. c. 111, § 204 (*b*). See also G. L. c. 111, § 203 (*c*). The individual defendant doctors who participated in the peer review committee (the GEC) were dismissed as defendants before trial. See note 15, *supra*. The discovery dispute, however, arose before they were dismissed.

to mislead the committee in some manner.[23],[24] The focus must
be on the committee member's actions within the peer review
committee process itself, not on possible discriminatory reasons
for initiating a review of the plaintiff's work. Cf. *Birbiglia* v.
*Saint Vincent Hosp., Inc.*, 427 Mass. 80, 84-86 (1998) (no
evidence warranting finding of "bad faith" in medical peer
review process where plaintiff made no attempt to demonstrate
what allegedly biased and knowingly false evidence hospital
relied on, and where plaintiff did not point to specific evidence
tending to prove that hospital's executive committee or board
knew that any evidence was biased or knowingly false). See
*Doe* v. *St. Joseph's Hosp. of Fort Wayne*, 42 Empl. Prac. Dec.
(CCH) par. 36,973 (N.D. Ind. 1987) (in discrimination case, to
overcome medical peer review privilege plaintiff must "allege
facts which create more than a mere inference that the actions
of the peer review committee were discriminatory, before the
court will permit even an in camera inspection of the com-

[23]"Good faith" has been defined in various contexts. See, e.g., *Dynan* v.
*Fritz*, 400 Mass. 230, 243 (1987) ("good faith requires a full and honest
disclosure of all relevant circumstances to permit a disinterested decision-
maker to exercise its informed judgment," in context of repurchase of
company stock from officer-director); *Commonwealth* v. *Sheppard*, 387 Mass.
488, 511 (1982) (Liacos, J., concurring) (in context of good faith police search
pursuant to defective warrant, "[a] proper legal definition of 'good faith'
involves not only a lack of malevolence, but also a reasonable effort to
comply·with the law"); G. L. c. 106, § 1-201 (19) (defining "good faith" as
"honesty in fact in the conduct or transaction concerned," in Massachusetts
Commercial Code context). See also Black's Law Dictionary 701 (7th ed.
1999) ("good faith" is "state of mind consisting in . . . honesty in belief or
purpose . . . faithfulness to one's duty or obligation, [or] absence of intent to
defraud or to seek unconscionable advantage").

[24]The language of the statute provides that there is no immunity from
discovery where a medical peer review committee member did not act "in
good faith and in the reasonable belief" that his actions were warranted. See
note 16, *supra*. We therefore focus on the term "good faith" rather than "bad
faith," as the plaintiff has done. Cf. *Ayash* v. *Dana-Farber Cancer Inst.*, 443
Mass. 367, 394 (2005) ("the medical peer review privilege does not extend to
physicians who participate [in the peer review] in bad faith," discussing G. L.
c. 111, § 203 [c]). In other contexts we have said that the term "bad faith"
"imports a dishonest purpose [and] implies conscious doing of wrong. It
means a breach of a known duty through some motive of interest or ill will
. . . [or] 'with actual intent to mislead or deceive another.' " *Spiegel* v.
*Beacon Participations, Inc.*, 297 Mass. 398, 416 (1937), quoting *Penn Mut.
Life Ins. Co.* v. *Mechanics' Sav. Bank & Trust Co.*, 73 F. 653, 654 (6th Cir.
1896).

munications to, records of or determination of the peer review committee").

Here, Dr. Suit's concerns about the plaintiff's performance were initially triggered in substantial part by the complaint received from Dr. Hartford. His concerns were heightened when he received Dr. Thornton's comprehensive letter outlining numerous performance shortcomings of the plaintiff. There is no allegation by the plaintiff that either Dr. Hartford or Dr. Thornton harbored any animus toward him.[25] Their respective written complaints to Dr. Suit would give rise to the gravest concern of any supervising physician. Patients receiving treatment in the department are extremely ill, subjected to life-threatening treatments. Had the express concerns of Dr. Hartford and Dr. Thornton not been acted on, and had the scrutiny of the plaintiff's work not intensified, Dr. Suit could well have been viewed as derelict in his duties. In Massachusetts, as elsewhere, medical peer review is not a choice, but a legislative requirement. See G. L. c. 111, § 203. No physician is at liberty to avoid that mandate. Even assuming that Dr. Suit had treated the plaintiff "differently" in some respect because he is homosexual (by recommending to the GEC that the plaintiff's privileges be limited rather than merely reporting his concerns to the GEC, for example), the plaintiff has not pointed to evidence that discriminatory animus rather than a legitimate concern for patient care infected the actual medical peer review process.[26] See *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 399 (2005) (evidence did not warrant inference that

---

[25]The plaintiff describes Dr. Hartford as a "disgruntled" medical resident.

[26]In support of his pretrial motion to compel discovery of the medical peer review materials, the plaintiff pointed to the following as evidence of "bad faith": (1) there were conflicting accounts in depositions by Dr. Suit, the clinical director, and a hospital employee regarding whether the clinical director had made homophobic comments; (2) Dr. Suit did not report concerns about the plaintiff's performance to a peer review committee before recommending to the GEC that the plaintiff's privileges be limited, which, according to the plaintiff, did "not appear to be standard practice"; and (3) Dr. Slavin's deposition testimony that a particular physician was present at the GEC meeting and that that physician corroborated Dr. Suit's assessment of the plaintiff was inconsistent with the physician's testimony at the staff review committee hearing. The first two examples do not pertain to activities of the peer review committee and are therefore irrelevant. As to the third, even if Dr. Slavin's deposition testimony did not accurately reflect what in fact occurred

supervising physician's "misplaced focus" on plaintiff was "deliberate, or motivated by a 'spiteful, malignant purpose' to hurt the plaintiff that was unrelated to [supervising physician's] professional responsibilities" [citations omitted]).

We emphasize that, in the face of the hospital's opposition to the plaintiff's broad discovery requests, the judge ordered the hospital to produce substantial discovery. The plaintiff reviewed, among other items, the written materials that triggered Dr. Suit's concerns; the promotional files for other doctors considered for academic positions at Harvard Medical School; all residency teaching evaluations of medical staff members from 1990 to 1996; and the transcripts and other records of the staff review committee. The plaintiff deposed all of the key decisionmakers. The only information not ordered disclosed was the privileged materials of the peer review committees. We also note that the thrust of the plaintiff's challenge was to obtain not the materials of the GEC when it acted on Dr. Suit's complaint concerning the plaintiff himself, but the records of numerous other peer review proceedings that had nothing to do with the plaintiff. See notes 19 and 20, *supra*. That the plaintiff did not seek an interlocutory appeal from the small segment of documents not ordered produced speaks volumes of the lack of importance he attached to those documents before trial.

The Legislature has made clear that, in this Commonwealth, discrimination on the basis of sexual orientation is against public policy and shall not be tolerated. See G. L. c. 151B, § 4. It has established and funded a special commission to investigate and

at the GEC, there is no claim by the plaintiff that the physician who may or may not have been present at the GEC (a peer review committee) harbored any bias toward the plaintiff or misled the GEC in any respect.

On appeal, the plaintiff asserts that he elicited testimony at trial to the effect that a staff review committee rarely recommends that the board revise a prior decision with respect to medical staff privileges, as it did here. He argues that the discipline imposed on him therefore was inconsistent with the hospital's standards and that, in such circumstances, he made a sufficient showing of "bad faith" to require discovery. We do not agree. First, this testimony was elicited at trial, and not brought to the judge's attention at the discovery stage, as it could have been: the plaintiff was free to depose the same witnesses and ask them the same questions during discovery. In any event, the reversal of a prior board decision does not necessarily mean that medical peer review committee members did not act in good faith and in the reasonable belief that their actions were warranted.

pass on complaints of unlawful discrimination. See G. L. c. 6, § 56. See also G. L. c. 151B, §§ 2, 3. The Legislature has also sought to eradicate "conduct by a health care provider that indicates incompetency . . . or conduct that might be inconsistent with or harmful to good patient care or safety." G. L. c. 111, § 203 (a). In balancing these two important societal goals, the Legislature did not provide a blanket exception to the medical peer review privilege where there is a claim that a physician's actions are motivated by discriminatory animus. The medical peer review privilege was enacted to promote "the uninhibited expression of professional opinions before a [peer review committee] and protects the [peer review committee's] work product." *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med.*, 401 Mass. 172, 183 (1987).[27] It is that work of the committee that the privilege protects, and unless the work can be shown to be tainted, then the privilege applies. See *id.* at 182 ("reading the exception to the [medical peer review] privilege narrowly is consistent with our cases where we have refused to add to the listed exceptions to a given statutory privilege"). See also *Doe* v. *St. Joseph's Hosp. of Fort Wayne*, 42 Empl. Prac. Dec. (CCH) par. 36,973 at 46,737 (N.D. Ind. 1987) (in discrimination case statutory "privilege granted to the peer review committee ought to be sedulously fostered").

The plaintiff relies on discrimination cases in which Federal courts have declined to recognize a Federal common-law medical peer review privilege. See, e.g., *Virmani* v. *Novant Health, Inc.*, 259 F.3d 284, 289 (4th Cir. 2001) (refusing to recognize privilege under Federal common law for medical peer review records in Federal discrimination actions, because "interest in

[27]The purpose served by the medical peer review privilege is similar in some respects to the attorney-client privilege, which is "founded on the necessity that a client be free to reveal information to an attorney without fear of its disclosure, in order to obtain informed legal advice." *Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109, 111 (1997). Although the attorney-client privilege "creates an inherent tension with society's need for full and complete disclosure of all relevant evidence," *Matter of a John Doe Grand Jury Investigation*, 408 Mass. 480, 482 (1990), quoting *In re Grand Jury Investigation*, 723 F. 2d 447, 451 (6th Cir. 1983), cert. denied, 467 U.S. 1246 (1984), "that is the price that society must pay for the availability of justice to every citizen." *Matter of a John Doe Grand Jury Investigation*, supra.

facilitating the eradication of discrimination by providing perhaps the only evidence that can establish its occurrence outweighs the interest in promoting candor in the medical peer review process").[28] Those cases are irrelevant because our Legislature has created a statutory medical peer review privilege that we must effectuate. In any event, our decision is not inconsistent with the Federal holdings on which the plaintiff relies. In each case a judge must determine whether a medical peer review privilege exists. The judge must then, and only then, examine whether the privilege applies to a particular document, as the judge did here. See *Carr* v. *Howard*, 426 Mass. 514, 529 (1998). Once the judge has made that determination, the burden shifts to the plaintiff to make a showing that the proceedings themselves (rather than the reasons for initiating the proceedings, which the plaintiff was free to discover) were not conducted "in good faith."

We have recognized that "the peer review privilege imposes some hardship on litigants seeking to discover information from hospital records, but the Legislature has clearly chosen to impose that burden on individual litigants in order to improve

---

[28]The plaintiff also points to several Federal courts that have determined that even where the privilege has been established by State statute, a Federal court sitting in that jurisdiction must determine as a matter of Federal law whether there is a Federal medical peer review privilege. See, e.g., *Marshall* v. *Spectrum Med. Group*, 198 F.R.D. 1, 4-5 (D. Me. 2000) (declining as matter of Federal common law in physician's action under Federal antidiscrimination law to recognize Federal peer review privilege despite existence of State privilege); *Johnson* v. *Nyack Hosp.*, 169 F.R.D. 550, 561 (S.D.N.Y. 1996) (holding that State medical peer review statute not applicable in Federal civil rights action and recognizing that Federal law does not recognize medical peer review privilege); *Robertson* v. *Neuromedical Ctr.*, 169 F.R.D. 80, 83-84 (M.D. La. 1996) (same); *LeMasters* v. *Christ Hosp.*, 791 F. Supp. 188, 191 (S.D. Ohio 1991) (same). However, several other Federal courts have applied State medical peer review privilege law in discrimination or civil rights cases. See, e.g., Komlosi *vs.* New York State Office of Mental Retardation & Dev. Disabilities, U.S. Dist. Ct. No. 88 Civ. 1792 (JFK) (S.D.N.Y. 1992) (applying New York peer review privilege law in Federal civil rights action); *Doe* v. *St. Joseph's Hosp. of Fort Wayne*, 42 Empl. Prac. Dec. (CCH) par. 36,973 (N.D. Ind. 1987) (applying Indiana State peer review privilege in discrimination case). See also *Brem* v. *DeCarlo, Lyon, Hearn & Pazourek, P.A.* 162 F.R.D. 94 (D. Md. 1995) (applying Maryland medical peer review privilege in Federal defamation action); *Mewborn* v. *Heckler*, 101 F.R.D. 691 (D.D.C. 1984) (applying District of Columbia peer review privilege in Federal Tort Claims Act action).

the medical peer review process generally." *Id.* at 532. We have carefully reviewed all of the materials before the judge that are included in the record. We have no doubt that, in this case, the plaintiff did not meet that burden.

3. *Hearsay evidence.* The plaintiff claims that it was error for the judge to admit in evidence the Hartford memorandum, see note 9, *supra,* and the Thornton letter and to permit testimony concerning their contents. At trial he objected to the admission of the two documents and to Dr. Suit's testimony about the Hartford memorandum only.[29] We focus our discussion on those claims.

We first describe the circumstances in which the challenged evidence was admitted. The hospital sought to admit the Hartford memorandum during Dr. Suit's testimony. The plaintiff objected, and the judge held a sidebar conference and ruled that the document was "coming in to show, if believed, why Dr. Suit took the action that he took." The document was admitted, and the judge gave the jury an appropriate limiting instruction. Dr. Suit then testified that he had received the document and spoken with Dr. Hartford, and explained to the jury why he thought each concern mentioned in the document was important. The following day Dr. Suit continued testifying about the substance of the Hartford memorandum, the plaintiff again objected, and the judge gave a second detailed and entirely correct limiting instruction to the jury. Later Dr. Hartford testified about his reasons for writing the memorandum, and testified, without objection, about the "essential problem" he had with the plaintiff and about the substance of some of the specific concerns contained in his memorandum.

During Dr. Suit's testimony, defense counsel also moved to admit the Thornton letter. The plaintiff objected on the ground of hearsay. The judge went through the letter paragraph by paragraph and ordered redaction of some of its contents. The redacted letter was admitted, and both Dr. Suit and Dr. Thornton were permitted to testify about its substance. The plaintiff did not object to Dr. Suit's testimony, nor did he raise any objection

---

[29]The plaintiff did not object on hearsay grounds to Dr. Hartford's testimony about his own memorandum, Dr. Suit's testimony about the Thornton letter, or Dr. Thornton's testimony about his letter to Dr. Suit.

while Dr. Thornton was testifying.[30] We now turn to the judge's rulings.

The admission of evidence is within the broad discretion of the judge. See *Zucco* v. *Kane*, 439 Mass. 503, 507 (2003). Here, the plaintiff maintains that testimony concerning the Hartford memorandum and the Thornton letter was admissible to prove only that the person to whom these materials were addressed, Dr. Suit, had notice or knowledge of their contents. Relying on *Commonwealth* v. *Rosario*, 430 Mass. 505, 509 (1999), the plaintiff argues that admission of the documents themselves, and the challenged testimony, should not have been permitted as this went "far beyond" the notice and knowledge under the exception, creating unfair prejudice to him.[31] There was no error.

Both the Hartford memorandum and the Thornton letter were themselves properly admitted to show notice and knowledge on the part of Dr. Suit. See P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 8.2.2, at 466 (7th ed. 1999) ("An extrajudicial statement is not hearsay when offered to prove that the person to whom it was addressed had notice or knowledge of the contents of the statement"). The documents and the related testimony also pertained directly to the hospital's lawful, nondiscriminatory reasons for its employment decisions concerning the plaintiff. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 117-118 (2000). Under the state of mind exception, both documents and the testimony concerning them were properly admitted to explain why Dr. Suit took the actions he did concerning the plaintiff. See P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence, *supra* at § 8.2.2, at 470-471 ("Where a statement is offered to prove the effect it had on the listener's state of mind, that state of mind must be relevant to an issue properly in the case"). See

---

[30]The plaintiff did object generally to Dr. Thornton's testimony before the letter was admitted. In response, the judge correctly told the plaintiff's attorney to register his specific objections when Dr. Thornton testified. During Dr. Thornton's testimony, the plaintiff did not raise any hearsay objection.

[31]In *Commonwealth* v. *Rosario*, 430 Mass. 505, 508 n.3 (1999), we noted that "a greater level of scrutiny of hearsay statements" is required in "the case of criminal trials." This appeal involves a civil trial, so this exacting scrutiny is not required.

also *Commonwealth* v. *Bregoli*, 431 Mass. 265, 273 (2000) ("A defendant's knowledge of the contents of the statements must be directly relevant for them to be admissible on this basis," referring to notice and knowledge exception).

All of the challenged evidence was relevant to Dr. Suit's state of mind insofar as it served as a basis for the adverse action he took against the plaintiff. The judge's two limiting instructions, one given when requested, ensured that the jury would not find that the underlying criticism of Dr. Hartford and Dr. Thornton was necessarily true.[32] There was no abuse of discretion.

4. *Jury instructions on the retaliation claim.* The plaintiff argues that the judge should have instructed the jury on two points relating to his retaliation claim. First, he claims that the judge improperly refused to instruct the jury that the nearness in time between the protected activity[33] and the adverse action permits an inference of retaliation. Next, he asserts that the judge should have informed the jury that, if the plaintiff reasonably and in good faith believed that the hospital had discriminated against him, filing a charge of discrimination with the MCAD was a per se reasonable activity. We turn first to the requested nearness-in-time instruction.

The jury are permitted to infer retaliation from the "timing and sequence of events." *Mole* v. *University of Mass.*, 442 Mass. 582, 592 (2004). Such an inference may be drawn "if adverse action is taken against a satisfactorily performing

---

[32]If requested, the judge presumably would have given the jury a limiting instruction with respect to the admission of the Thornton letter and testimony concerning the content of that letter. Where the plaintiff failed to request a limiting instruction concerning this evidence, and failed to object to Dr. Suit's testimony concerning the content of the letter, the judge did not abuse her discretion in admitting the evidence.

[33]Under G. L. c. 151B, § 4 (4), a plaintiff has engaged in a protected activity if "he has opposed any practices forbidden under this chapter or . . . has filed a complaint, testified or assisted in any proceeding under [G. L. c. 151B, § 5]," which provides for filing of complaints of discrimination with the Massachusetts Commission Against Discrimination (MCAD). It is unlawful under G. L. c. 151B, § 4 (4A), "[f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter . . . ."

employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity," or "[w]here adverse employment actions follow close on the heels of protected activity . . . ." *Id.* at 592, 595. We cautioned that where "adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation." *Id.* at 594. Having reviewed the evidence in this case, we conclude that the judge did not abuse her discretion in declining to give the requested instruction.

It is the general rule that "[t]he extent to which a judge shall discuss the evidence or the subsidiary facts is generally within [her] discretion." *Barnes* v. *Berkshire St. Ry.*, 281 Mass. 47, 50-52 (1932). We recognize that in a retaliation case such as this, there is often no direct evidence of discrimination or retaliation, and a plaintiff's proof will often depend on circumstantial evidence. Because direct evidence of retaliation is rare, a nearness-in-time instruction may fall within an exception to the general rule just stated: "Sometimes the issue depends upon the existence of some fact, theoretically subsidiary but practically decisive if found. In such a case, for a judge to ignore the simple concrete test and submit the case upon abstract general instructions blurs the point and may mislead the jury." *Id.* at 52. Cf. *Bouley* v. *Reisman*, 38 Mass. App. Ct. 118, 122-123 (1995) (instruction on possible inference not required where several inferences possible). Thus, although falling within a judge's discretion, in a discrimination or retaliation case based on circumstantial evidence, a nearness-in-time instruction should be given if the evidence supports it, and if requested. *Id.* Where there is conflicting evidence concerning the inference for which the instruction is requested, however, a judge retains her broad authority to decide whether to include the instruction. *Id.* at 123.

In this case there was sharply conflicting evidence regarding the sequence and timing of events. Specifically, there was conflicting evidence as to when the plaintiff first told Dr. Suit he was concerned about discrimination based on his sexual

orientation. See note 8, *supra.*[34] Moreover, by the time the plaintiff filed his MCAD complaint, Dr. Suit had already taken steps to limit the plaintiff's responsibilities based on Dr. Suit's concerns about the plaintiff's performance. See *Mole* v. *University of Mass., supra* at 594. Nothing precluded the plaintiff from arguing the point in his closing argument,[35] and the judge gave detailed instructions to the jury about their role in determining the credibility of the witnesses and the inferences the jury might draw from the circumstantial evidence presented at the trial on both the discrimination and retaliation claims. See *Bouley* v. *Reisman, supra* at 123. Once a judge has instructed that retaliation may be proved by circumstantial evidence, she may, within her discretion, give a more specific instruction (retaliation may be inferred if the jury find adverse employment action taken soon after an expression of protected activity), but need not be so specific when there is conflicting evidence on the point. Here, it was not an abuse of discretion for the judge to decline to give the more specific instruction.

The second claim of error concerns the judge's response to a jury question about the second element of a retaliation claim: that the plaintiff acted reasonably in response to his belief that his employer was discriminating against him. A retaliation claim requires proof that (1) the plaintiff reasonably and in good faith believed that the employer was engaged in wrongful discrimination; (2) that he acted reasonably in response to that belief; and (3) that there is a causal connection between the protected conduct and an adverse employment action. *Mole* v. *University of Mass., supra* at 591-592. On the second day of deliberations, the jury requested that the judge "clearly" define for them "what actions would have been 'reasonable' in filing a

---

[34]At trial, the plaintiff testified that in the summer of 1993, he spoke with Dr. Clyde Evans, director of the office for academic careers and associate dean for clinical affairs at the Harvard Medical School, regarding his concerns about his work environment. Dr. Evans testified that he could not recall the substance of that conversation. The plaintiff also testified that he spoke with Dr. Suit in the summer of 1993 about the clinical director's "poor attitude" and his "poor approach to gay patients." Dr. Suit did not testify concerning this conversation.

[35]In his closing argument, the plaintiff did not emphasize the nearness in time of the protected activity and the adverse action, suggesting that the issue was not as significant as the plaintiff now claims.

complaint with the MCAD," i.e., the second element. The judge advised the jury that this was a question for them to determine. Specifically, she instructed:

"[W]hether the filing was reasonable is entirely up to you to decide from all of the evidence that you have in this case. A reasonable person is an ordinarily sensible, prudent person, one who is discerning in the management of practical affairs."

The judge further instructed: "When I say 'reasonable person,' I mean a reasonable person in [the plaintiff's] position in all of the circumstances that you've heard about in this case on the date in question." On appeal, the plaintiff argues that where an individual reasonably and in good faith believes that discrimination has occurred, filing a charge of discrimination with the MCAD is per se reasonable and that the jury should have been so instructed.[36]

The judge properly instructed the jurors that the question of reasonableness was a question of fact for them to decide. To instruct the jury as the plaintiff requested would remove the is-

---

[36]The plaintiff also argues that if a "reasonableness" standard is applied — i.e., the test used to determine whether "oppositional activity" is protected — the standard should not be objective reasonableness, as the judge instructed, but rather a "not unreasonable" standard. The plaintiff did not object to the instruction on this basis. He requested that the standard be "a reasonable person in [the plaintiff's] shoes." The judge gave the requested instruction. To the extent the issue of an objective standard of reasonableness has any validity, it is waived.

The plaintiff also argues that upholding the jury instruction on retaliation will result in juries finding no retaliation whenever they find that the underlying discrimination claim has not been proved. The point has no merit. The judge specifically and correctly instructed the jurors:

"In proving a claim for retaliation, [the plaintiff] does not have to succeed on his underlying complaint of discrimination. Even if you find that [the plaintiff] does not prove that the hospital acted, actually discriminated against him because he [is] gay, you may still find that he has proven that the hospital retaliated against him for filing an internal complaint of discrimination against him or in initiating a legal proceeding at the [MCAD]."

As long as the jury are "[p]roperly instructed and acting under those instructions, the jury's verdict on discrimination [cannot affect] their verdict on retaliation." *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 122 (2000).

sue, a required element of establishing a claim of retaliation, from the jury. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 117-118 (2000) (jury instruction "should not have been given because it stripped the jury of its fact-finding role," where it informed jury that finding of pretext compelled finding of discrimination). It may be that in many cases, once the jury find that the plaintiff held a good faith and reasonable belief of discrimination, the jury will also find that the plaintiff's charge of discrimination with the MCAD was reasonable. But that is not the only possible outcome. As the judge noted, the filing of a charge can be used as "a smoke-screen in challenge to the supervisor's legitimate criticism." *Monteiro* v. *Poole Silver Co.*, 615 F.2d 4, 8 (1st Cir. 1980).[37] The judge properly determined that the jury should decide whether in this particular case the plaintiff's filing of a charge with the MCAD was reasonable.

*Judgment affirmed.*

---

[37]The plaintiff argues that the question whether filing a charge of discrimination was a "preemptive strike" (in the judge's term) or a "smokescreen," *Monteiro* v. *Poole Silver Co.*, 615 F. 2d 4, 8 (1st Cir. 1980), is encompassed by the first element of a retaliation claim. We do not agree. The first prong of a retaliation claim requires that the finder of fact consider only the plaintiff's belief. The second prong of a retaliation claim directs the finder of fact to consider the plaintiff's actions: whether the plaintiff "acted reasonably in response to [his] belief." *Abramian* v. *President & Fellows of Harvard College, supra* at 121, quoting *Tate* v. *Department of Mental Health*, 419 Mass. 356, 364 (1995). Although the filing of a charge of discrimination is a "protected" activity under G. L. c. 151B, § 4 (4), it may not be "reasonable" for purposes of proving retaliation.