WILLIAM VRANOS[1] *vs.* FRANKLIN MEDICAL CENTER
& others.[2,3]

Franklin. December 6, 2006. - February 27, 2007.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & CORDY, JJ.

*Libel and Slander. Practice, Civil,* Discovery. *Privileged Communication. Doctor,* Privileged communication. *Evidence,* Privileged record. *Hospital,* Peer review.

In a defamation action brought by a physician, the judge, in ordering the production of certain documents as a part of discovery, erred in designating credentialing communications between the defendants and third parties as outside the scope of the medical peer review privilege [435-436], and in concluding that other peer review documents fell within the narrow exception for peer review activities not undertaken in good faith, where the plaintiff's conclusory and unverified statements did not constitute evidence to support his discovery claims, and where the plaintiff failed to point to any evidence of misconduct within the peer review process [436-440].

[1]The documents filed in this action were ordered temporarily impounded and unavailable for public inspection on March 8, 2005, as a result of a joint motion. On March 16, 2006, a Superior Court judge signed an impoundment order after hearing from both parties. Counsel agreed that impoundment was in the best interests of the parties and in the public interest to safeguard the confidentiality of statutorily protected peer review materials and documents. We conclude on inspection of the orders that the purpose of impoundment was to protect the confidentiality of *documents,* including the pleadings and the peer review materials at issue, excluding names of parties and facts of the case. Counsel for the plaintiff openly acknowledged at oral argument that "the purposes [for impoundment] have long since become superseded by the way in which this case has evolved in the court." The initial order was designed for very limited purposes to accommodate the needs of the parties at the time, and no real need for impoundment currently exists. In so holding, we reiterate our previous observation that "impoundment is always the exception to the rule, and the power to deny public access to judicial records is to be 'strictly construed in favor of the general principle of publicity.' " *Republican Co.* v. *Appeals Court,* 442 Mass. 218, 223 (2004), quoting *Commonwealth* v. *Blondin,* 324 Mass. 564, 571 (1949), cert. denied, 339 U.S. 984 (1950).

[2]Michael D. Skinner and Kenneth Gaspard.

[3]We acknowledge the briefs of amicus curiae filed on behalf of the Massachusetts Medical Society and the Massachusetts Hospital Association.

CIVIL ACTION commenced in the Superior Court Department on March 3, 2005.

A motion to compel discovery was heard by *John A. Agostini*, J., and a motion for reconsideration was heard by him.

Leave to prosecute an interlocutory appeal was allowed in the Appeals Court by *Mark V. Green*, J. The Supreme Judicial Court granted an application for direct appellate review.

*Francis D. Dibble, Jr. (Gaston de los Reyes* with him) for the defendants.

*Thomas T. Merrigan (Paul W. Shaw* with him) for the plaintiff.

The following submitted briefs for amici curiae:

*Carl Valvo & John R. Hitt* for Massachusetts Medical Society.

*Colin J. Zick & Kalah E. Auchincloss* for Massachusetts Hospital Association.

MARSHALL, C.J. In this defamation action brought by a physician, the defendant hospital and hospital administrators appeal from an interlocutory order of a Superior Court judge ordering production of documents and responses to interrogatories the defendants claim are protected from discovery under the "medical peer review privilege." See G. L. c. 111, §§ 204 (*a*)-(*b*) and 205 (*b*).[4] The information ordered to be produced included credentialing communications between the defendants and third parties and materials related to the physician's summary suspension from the hospital after an incident of alleged verbal and physical threatening behavior and the consequent activities of the hospital's medical peer review committee.[5]

---

[4]General Laws c. 111, § 204 (*a*), states in relevant part: "[T]he proceedings, reports and records of a medical peer review committee shall be confidential and . . . shall not be subject to subpoena or discovery, or introduced into evidence."

General Laws c. 111, § 205 (*b*), provides: "Information and records which are necessary to comply with risk management and quality assurance programs established by the board of registration in medicine and which are necessary to the work product of medical peer review committees, including incident reports required to be furnished to the board of registration in medicine . . . shall be deemed to be proceedings, reports or records of a medical peer review committee for purposes of [G. L. c. 111, § 204] . . . ."

[5]"Medical peer review committee" is defined in G. L. c. 111, § 1, as "a committee of a state or local professional society of health care providers . . .

In ordering discovery of the disputed documents, the judge concluded that the credentialing communications fell outside the ambit of privileged medical peer review materials, and that the other information requested, while within the privilege, must nevertheless be produced under the statutory exception for peer review activities not undertaken in good faith. See G. L. c. 111, §§ 204 (*b*), 205 (*b*); G. L. c. 231, § 85N. Thus, we are asked once again to examine the extent to which communications for the purpose of medical peer review may be kept confidential and for what purposes the privilege may be pierced. See *Pardo* v. *General Hosp. Corp.*, 446 Mass. 1 (2006). For the reasons discussed below, we conclude that the order must be vacated and the case remanded for further proceedings consistent with our opinion.

1. *Background.* We summarize the relevant facts from the judge's memorandum of decision and from the record, reserving the recitation of other relevant facts for later discussion. The defendant Franklin Medical Center (FMC) is a licensed Massachusetts hospital. As such, it is required by stringent Federal and State laws and regulations to maintain quality assessment and risk management programs. Among these programs are policies and procedures to report and address behavior by hospital staff that might be inconsistent with or harmful to good patient care or safety. G. L. c. 111, § 203 (*a*)-(*d*). Accordingly, FMC established medical staff bylaws that provided, among other things, for the summary suspension of a physician's membership or clinical privileges when necessary to "reduce the substantial likelihood of injury or damage to the health or safety of any patient, employee, or other person at the Medical Center; or . . . [f]or the continued effective operation of the Medical Center."[6] FMC also established a separate policy on

___

or of a medical staff of a public hospital or licensed hospital . . . which committee has as its function the evaluation or improvement of the quality of health care rendered by providers of health care services, the determination whether health care services were performed in compliance with the applicable standards of care . . . [or] the determination of whether a health care provider's actions call into question such health care provider's fitness to provide health care services . . . ."

[6]Section 2.1 of the FMC bylaws provides in full: "Summary suspension of

medical staff "disruptive behavior" that specifies the targeted behavior[7] and set out detailed procedures for documentation, investigation, notice to the physician with the opportunity to respond, and "corrective" actions.[8]

a practitioner's Medical Staff membership or all or any portion of a practitioner's clinical privileges, or both, may be imposed whenever the failure to take such action may result in an imminent danger to the life, health, or safety of any individual or otherwise whenever a practitioner's acts or conduct require that immediate action be taken: (a) To protect the life of any patient; (b) To reduce the substantial likelihood of injury or damage to the health or safety of any patient, employee, or other person at the Medical Center; or (c) For the continued effective operation of the Medical Center."

[7]"Disruptive behavior may include, but is not limited to, the following:

"Verbal (or physical) assaults that are personal, irrelevant, rude, insulting, or otherwise inappropriate or unprofessional.

"Inappropriate or unprofessional expressions of anger, destruction of property, or throwing items.

"Hostile, angry, abusive, aggressive, or confrontational voice or body language.

"Language or criticism directed to the recipient in such a way as to ridicule, intimidate, undermine confidence, or belittle.

"Derogatory, derisive, or otherwise inappropriate or unprofessional comments concerning other Members, FMC staff, health care providers, or caregivers made to patients, family members, or others.

"Malicious, arbitrary, or otherwise inappropriate or unprofessional comments made orally or noted in a medical record.

"Disregard for FMC or Medical Staff policies and procedures or the. refusal to work cooperatively with others or to participate in committee or departmental affairs."

[8]The American Medical Association (AMA) has published guidelines for treatment of and discipline for physicians with disruptive behavior. The AMA recommends that medical staff develop and adopt bylaw provisions or policies for intervening in situations where a physician's behavior is identified as disruptive. Suggestions for implementation of such policies include establishing a process to review or verify reports of disruptive physician behavior, establishing a process to notify a physician whose behavior is disruptive that a report has been made, providing the physician with an opportunity to respond to the report, monitoring improvement after intervention, providing for evaluative and corrective actions, and providing clear guidelines for the protection of confidentiality. See American Medical Association, Physicians and Disruptive Behavior (July 2004). See also 243 Code Mass. Regs. § 3.01 (1993): "[E]nhancement of patient care assessment will be accomplished through the strengthening and formalizing of programs of credentialing, quality assurance,

The incident that precipitated this litigation occurred at approximately 7 A.M. on October 28, 2004, at a regularly scheduled meeting of FMC's surgical support services committee. In attendance was the plaintiff, William Vranos, an orthopedic surgeon who was a partner in Franklin Orthopedic Group in Greenfield, a member of the medical staff of FMC, and, since January, 2002, chief of FMC's department of surgery. Also attending were Henry K. Godek, FMC chief of anesthesia; the defendant Kenneth Gaspard, director of surgical and material services; and Kim Cotter, Gaspard's assistant.

During the meeting, Vranos and Gaspard exchanged heated words over a new policy that would restrict the availability of surgical services. The parties agree that the argument quickly escalated, although they offer differing accounts of who used inappropriate and threatening verbal and body language to whom. It is uncontested that approximately ten days before the meeting, forty-nine members of the department of surgery, including Vranos, signed a "memorandum of concern" (memorandum) expressing doubts about the judgment of Gaspard and Cotter in managing the surgical department.

Shortly after the meeting, Gaspard reported to the defendant Michael D. Skinner, FMC's president, that he had been physically threatened and verbally abused by Vranos at the meeting. Gaspard told Skinner that Vranos raised his voice repeatedly, slammed charts and documents down on the table, grabbed a chair and threw it aside, and angrily demanded that Gaspard remain in the meeting when Gaspard wanted to leave. Gaspard told Skinner that he was afraid during the incident that Vranos might hit him, and that he still felt unsafe.

Skinner and Vranos had had previous dealings concerning Vranos's relationship to FMC. Specifically, for nearly six months prior to October 28, 2004, Skinner attempted to recruit Vranos to leave the Franklin Orthopedic Group and establish a competing orthopedic practice at FMC. Vranos had declined Skinner's offer and instead, in September, 2004, accepted a position at Brattleboro Memorial Hospital in Vermont, less than twenty miles from FMC, effective January 1, 2005.

utilization review, risk management and peer review in institutions and by assuring that these functions are thoroughly integrated and overseen by the institutions' corporation and physician leadership."

At approximately 8:30 A.M. on the day of the altercation, Skinner met with Cotter and John Brady, FMC's director of human resources. Cotter corroborated Gaspard's version of events, and said she had been frightened during the encounter between Vranos and Gaspard. At one point during her meeting with Skinner and Brady, Cotter began to tremble and cry. Subsequent to these meetings, Skinner arranged for the vice-president of hospital operations and the director of employee relations to interview Gaspard and Cotter to confirm their accounts.

On October 29, 2004, Skinner called Vranos to his office. During the meeting, Skinner handed Vranos a notice of a summary suspension, effective immediately.[9] The notice stated in part that Vranos "used intimidating, abusive, and hostile language and exhibited threatening behavior, including picking up a stack of papers and slamming them down on the table, picking up a chair and slamming it down in the conference room, and placing [himself] physically close to one or more individuals while speaking in loud, angry, and confrontational manner [during the October 28 meeting]." The notice also stated that Vranos had "a history of disruptive behavior . . . [and] unprofessional conduct . . . at FMC," and that Vranos's behavior and conduct "has been perceived to be intimidating, abusive, hostile, and physically threatening."[10]

The judge determined, for purposes of the discovery order, that, prior to issuing the notice to Vranos, Skinner did not give Vranos the opportunity to explain himself. Nor did Skinner contact Godek prior to issuing the summary suspension or consult with the patient care assessment coordinator as provided in FMC's policy addressing disruptive physician behavior. However, pursuant to its medical staff bylaws, within three business days of the suspension, on November 3, 2004, FMC convened a medical staff summary suspension review committee (review committee) to consider the terms of Vranos's suspension and to advise FMC's

[9]In his complaint, Vranos alleged that the notice was handed to him at the beginning of the meeting. Skinner averred in an affidavit that he handed the notice of summary suspension to Vranos only after hearing Vranos's versions of events and finding them not credible.

[10]Skinner's affidavit states that, prior to summarily suspending Vranos, Skinner was aware of previous instances of disruptive behavior on Vranos's part, an allegation that Vranos in his unverified pleadings strenuously denies.

board of trustees whether to continue, modify, or terminate the suspension. The bylaws provided that the review committee be composed of various officers and staff, including the president or a designated representative. Skinner was a member of the review committee that considered Vranos's suspension on November 3.

After reviewing submissions by Vranos, Godek, Gaspard, Cotter, Skinner, and several other physicians, the committee recommended that Vranos's suspension be lifted provided that he (1) resign as chief of surgery; (2) apologize to Gaspard and Cotter; and (3) seek anger management counseling or its equivalent. The FMC board of trustees (trustees) accepted the recommendation on November 9. Vranos agreed to the terms, and the suspension was lifted that day. Vranos waived his right to a hearing to challenge his suspension and returned to work on November 10, with full medical staff membership and clinical privileges.

On March 3, 2005, Vranos filed his unverified complaint for defamation against FMC, Skinner, and Gaspard.[11] The gravamen of Vranos's complaint is that, in the course of the summary suspension investigation and review, Skinner and Gaspard published untrue statements about Vranos's professional conduct that were motivated by their animus toward Vranos as a result of their prior interactions with him, as recounted above.[12] In the course of discovery, Vranos requested production of two categories of information: (1) documents and responses to inter-

---

[11]Vranos had filed an earlier action in the Superior Court that the defendants successfully removed to the United States District Court for the District of Massachusetts and that Vranos subsequently voluntarily withdrew.

Vranos's initial complaint in this action consisted of six counts, including defamation against Gaspard, Skinner, and FMC; breach of contract by FMC; violation of the duty of good faith and fair dealing by FMC; violation of the Massachusetts Civil Rights Act against Skinner and FMC; and interference with contractual and advantageous relations by Skinner. The defendants moved to dismiss all counts under Mass. R. Civ. P. 12 (b) (6), 364 Mass. 754 (1974), for failure to state a claim. A Superior Court judge dismissed four of the six counts, and denied the motion to dismiss on the defamation counts.

[12]Specifically, Vranos's complaint and subsequent pleadings allege that Gaspard and Cotter were seeking revenge for Vranos's signing the memorandum of concern about their leadership, and that Skinner was worried that, in light of Vranos's reputation in the community and the proximity of his new hospital to FMC, FMC would lose revenue as a result of Vranos's departure.

rogatories concerning credentialing communications between FMC and other hospitals, State regulators, and other credentialing organizations (credentialing materials)[13]; and (2) material prepared for the summary suspension of Vranos in connection with the peer review committee, including incident reports, memoranda, narrative statements, committee minutes, and other documents submitted to the review committee and the board of trustees (disputed peer review documents).[14] The defendants objected to the majority of the requests on the basis of the medical peer review privilege, and Vranos subsequently moved to compel discovery, which the judge allowed in relevant part.[15] Simultaneously, the hospital petitioned for reconsideration and

[13]Request no. 14 of Vranos's first request for production of documents included: "All documents submitted to the Massachusetts Board of Registration in Medicine, the Vermont Board of Medical Practice, Brattleboro Memorial Hospital, and any other entity concerning plaintiff's summary suspension, including copies of reference letters sent by Drs. Blomstedt and Blacksin to Brattleboro Memorial Hospital." The judge ordered that this request be answered. The judge also ordered responses to related interrogatories, including, for example, no. 1: "In the ten years prior to October 29, 2004, how many summary suspensions were imposed on members of the FMC medical staff?"; no. 3: "In the two years prior to October 29, 2004, how many corrective actions were initiated against members of the FMC medical staff?" The judge grouped such material under the caption "Non-Peer Review Discovery," without further elaboration.

[14]The judge found that Skinner's affidavit describes six categories of documents withheld on the ground of privilege: "(1) Physician incident reports prepared by Gaspard and Cotter; (2) a narrative statement describing the incident prepared by Godek; (3) memoranda to the file following the incident by Skinner 'or by others' and submitted to Skinner, concerning conversations with Gaspard, Cotter, and Vranos; (4) documents submitted to the committee convened pursuant to the bylaws to review the summary suspension and the minutes of a meeting of the summary suspension review committee; (5) documents submitted to the [trustees] concerning the [trustees'] review of summary suspension; and (6) correspondence to the plaintiff concerning the summary suspension, including 'special notice of summary suspension' and a 'notice of final action.' " FMC also produced a privilege log describing sixty-eight documents withheld from production and the privileges cited for each.

[15]The judge first ordered production of various documents and interrogatories designated by the judge to be "Non-Peer Review Discovery," including those documents relating to credentialing communications. In this category, the judge also ordered FMC to produce Vranos's medical staff file, stating that if FMC contended that the documents in the staff file are protected by peer review, such documents shall be provided to the court for an in camera inspection. Second, the judge ordered production of a subset of documents requested by Vranos relating to the peer review process, but subject to

for interlocutory review by a single justice of the Appeals Court pursuant to G. L. c. 231, § 118. The motion for reconsideration was denied on April 24, 2006, and on May 11, 2006, the single justice granted FMC's petition. On July 19, 2006, we granted Vranos's application for direct appellate review.

2. *Discussion.* Because our opinion involves the complex regulatory scheme governing health care facility quality assessment and risk management, we begin with a brief summary of that scheme, which we have described at some length in prior cases. See, e.g., *Carr* v. *Howard*, 426 Mass. 514, 517-526 (1998); *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med.*, 401 Mass. 172, 177-182 (1987).

a. *Medical peer review.* Strong public policy mandates the highest quality of care in our health care facilities. That public policy finds voice in, among others, a strict regulatory scheme covering virtually all aspects of hospital operations. Integral to this regulatory scheme is an effective process for self-scrutiny, manifest most prominently in the medical peer review process. For more than twenty years, both Federal and State laws have required and regulated medical peer review committees in hospitals, and for that same length of time, laws have protected the confidentiality of medical peer review proceedings. See generally *Carr* v. *Howard*, *supra* at 517-518. The Health Care Quality Improvement Act, 42 U.S.C. §§ 11101-11152 (2000), first enacted in 1986, codified Federal standards for medical peer review that provided limited immunity to committee members and made confidential documents submitted to a national physicians' data bank. See *id.* Following passage of the Health Care Quality Improvement Act, the Legislature enacted laws and the Board of Registration in Medicine (board) promulgated regulations that progressively offered increased immunity for medical peer review committee members and witnesses and privilege against subpoena, discovery, and the use in

the "single, narrow exception" to the prohibition against discovery. FMC subsequently filed a request for in camera inspection of itemized documents from Vranos's medical staff file. In his order on four posttrial motions, the judge withheld a decision on the issue of in camera inspection pending any order of the Appeals Court. The judge denied FMC's motion for reconsideration, and allowed motions for protective orders for the credentialing documents and business documents.

evidence of documents related to medical peer review. See *id.* at 518-519. We have recognized that the intent of these confidentiality provisions is "[t]o 'promote candor and confidentiality' in the peer review process . . . and to 'foster aggressive critiquing of medical care by the provider's peers.' " *Pardo* v. *General Hosp. Corp.*, 446 Mass. 1, 11 (2006), quoting *Carr* v. *Howard, supra* at 518, and *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med., supra* at 182. To advance the Legislature's purpose, we have reviewed the statutory medical peer review privilege broadly. See, e.g., *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med., supra* (G. L. c. 111, § 204 [*a*], establishes "a broad privilege").

Taken together, G. L. c. 111, §§ 204 (*a*) and 205 (*b*), provide weighty protection to a medical peer review committee's work product and materials. They express the Legislature's considered judgment that the quality of health care is best promoted by favoring candor in the medical peer review process. Necessarily, the interests of the general public in quality health care are elevated over the interest of individual health care professionals in unfettered access to information about peer review of their actions. See *Carr* v. *Howard, supra* at 532 ("the peer review privilege imposes some hardship on litigants seeking to discover information from hospital records, but the Legislature has clearly chosen to impose that burden on individual litigants in order to improve the medical peer review process generally").

Nevertheless, the staff member at the center of the medical peer review process is not without recourse to ensure fairness. Medical peer review committees are required by Federal and State laws and regulations to provide medical personnel with notice and an opportunity to be heard about decisions of a peer review committee affecting them. See G. L. c. 111, § 203 (*b*); 42 U.S.C. § 11112(a)(3). Testimony from members of, or witnesses before, a medical peer review committee may be obtained "as to matters known to such persons independent of the committee's proceedings." G. L. c. 111, § 204 (*c*). See 243 Code Mass. Regs. § 304(4) (1994). Information "otherwise available from original sources" may be discoverable even if presented to a peer review committee. G. L. c. 111, § 204 (*b*). See also G. L. c. 111, §§ 204 (*a*), 205 (*b*).

The Legislature has permitted the subject of a medical peer review to pierce the statutory privilege to establish a cause of action against the member of a peer review committee for the member's failure to act in good faith pursuant to G. L. c. 231, § 85N. We have recognized that the exception for failure to act in good faith must be construed narrowly to preserve the purposes of the peer review privilege to promote good health care. See *Pardo* v. *General Hosp. Corp.*, *supra* at 10-11. Therefore, the exception operates to invade the peer review privilege only "on some threshold showing that a member of a medical peer review committee did not act in good faith in connection with his activities as a member of the committee, for example did not provide the medical peer review committee with a full and honest disclosure of all the relevant circumstances, but sought to mislead the committee in some manner." *Id* at 11-12.

We now consider whether the judge properly ordered production of the disputed communications.

b. *Credentialing communications.* The judge ruled that credentialing communications concerning Vranos between the defendants and the board, the Vermont Board of Medical Practice, Brattleboro Memorial Hospital, and other credentialing organizations were not covered by the medical peer review privilege and must be produced. This was error.

First, the defendants' communications to the board concerning Vranos's conduct, including peer review materials, were not voluntary but rather mandated as part of the hospital's obligation to participate in health care facility quality assessment and risk management programs. See, e.g., G. L. c. 111, § 53B; 243 Code Mass. Regs. § 2.07(17)(c) (1995) ("an essential element of a Patient Care Assessment Program pursuant to 243 [Code Mass. Regs. §§] 3.00, is that a reporting entity report any 'disciplinary action' to the Board relating to any employment practice, association for the purpose of providing patient care, or privileges"); G. L. c. 112, § 5F ("Any health care provider . . . shall report to the board any person who there is reasonable basis to believe is in violation of . . . any of the regulations of the board . . ."). These materials do not lose their character as "proceedings, reports and records" pursuant to

G. L. c. 111, § 204 (*a*), or information and work product "necessary" to meet the hospital's statutory risk management and quality assessment programs pursuant to G. L. c. 111, § 205 (*b*), merely because they are required to be furnished to the board. To hold otherwise would severely undermine the Legislature's carefully constructed scheme to promote systemwide good health care, for the statutory obligation to report incidents of unprofessional physician behavior would render meaningless the incentives confidentiality and privilege offer to peer review committee members and witnesses to proceed in all candor. A similar analysis pertains to the credentialing documents the hospital was required to send to Brattleboro Memorial Hospital in response to its credentialing inquiry. *Carr* v. *Howard, supra* at 524-525. See 243 Code Mass. Regs. §§ 3.05, 3.12(1)(d) (1994).

Finally, although Massachusetts laws and regulations do not expressly require a health care facility to provide credentialing information to another State's board of registration in medicine, we assume without deciding that applying the medical peer review privilege to such communications is also consistent with the Legislature's intent to provide broad protection for candid assessments of a physician's performance. See 243 Code Mass. Regs. § 3.01 (board regulations intended to promote "active self-scrutiny and reporting of adverse incidents in in-patient and out-patient settings to permit individual physicians, institutions and the Board to recognize patterns requiring corrective action"). See also *Carr* v. *Howard, supra* at 517-519; *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med.,* 401 Mass. 172, 182 (1987).

In short, the judge erred in designating the credentialing communications outside the scope of the medical peer review privilege.

c. *Peer review privilege.* We next address the order to produce the disputed peer review documents.[16] We consider only whether the judge erred in concluding that these docu-

---

[16]There is no dispute that the documents falling in this category (e.g., proceedings, reports, and records) are peer review materials. *Miller* v. *Milton Hosp. & Med. Ctr., Inc.,* 54 Mass. App. Ct. 495, 499 (2002), instructs that a reviewing court first determine whether the records for which the privilege is

ments fell within the "single, narrow exception to the privilege 'to establish' that a member of a peer review committee did not act 'in good faith and in the reasonable belief that based on all of the facts the action or inaction on his part was warranted' during the peer review process." *Pardo* v. *General Hosp. Corp.,* *supra* at 11, citing G. L. c. 111, § 204 (*b*), and G. L. c. 231, § 85N. See *id.* at 12 n.24 (distinguishing claims for "bad faith" from claims for failure to act in "good faith").[17] The judge cited two pieces of "undisputed evidence" as "key" to his conclusion that the privilege should be abrogated. First, "there were circumstances attendant to the incident which *suggest* the *possibility* of ulterior motives on the part of Skinner" (emphases added), including the possibility of FMC losing revenue when Vranos switched hospitals, see note 12, *supra,* and Vranos's signature on the memorandum of concern. Second, "the nature and vigor" of Skinner's investigation of Vranos "*indicates* that Skinner *may* have used the peer-review process without the requisite good faith" (emphases added). These suspicions, as we shall explain, are insufficient to pierce the thick armor of the privilege.

As an initial matter, we note that Vranos did not in fact submit *any* evidence to support his discovery claims. His discovery argument rests on the claims that "[g]ood faith was missing because Skinner's *animus* was unrelated to [Vranos's] professional qualities, which caused Skinner to purposefully avoid exculpatory facts about the incident and to avoid investigating

claimed clearly fall within the privilege on their face. If the records are not facially privileged, the court should consider evidence proffered by the party asserting the privilege. The aim of the inquiry is to determine whether the document was created by, or otherwise as a result of a "medical peer review committee." See *Carr* v. *Howard,* 426 Mass. 514, 531 (1998). For purposes of the present action, we will assume, without further inquiry, and in accordance with the judge's conclusion, that the records considered by the reviewing committee fall within the privilege. These include: memoranda following the incident by Skinner or others, documents submitted to the committee and the minutes of the suspension review committee, documents submitted to the trustees, and correspondence to the plaintiff concerning the summary suspension.

[17]*Pardo* v. *General Hosp. Corp.,* 446 Mass. 1 (2006), was issued while the judge was considering the parties' respective discovery motions and was discussed in the judge's memorandum of decision in a section entitled "Bad Faith Exception to the Peer Review Privilege."

the facts in a reasonable manner." However, Vranos's complaint was unverified, and unlike Skinner, he never submitted an affidavit to establish a factual foundation supporting his position. Thus, despite the judge's reference to "the collective weight of the evidence" in favor of Vranos, any evidence before the judge was submitted by and in support of the defendants; the only evidence on the record was the uncontested testimony proffered in Skinner's affidavit. In spite of this, the judge held in favor of the plaintiff's conclusory and unverified statements. This reliance alone would be a ground to vacate the order.[18]

With specific reference to the medical peer review privilege, we have taken pains to emphasize that "mere inference" will not suffice to meet the movant's burden to pierce the medical peer review privilege. *Pardo* v. *General Hosp. Corp.*, *supra* at 12; *Carr* v. *Howard*, *supra* at 531 (privilege may not be pierced where plaintiff has provided "no contradictory evidence" to show that documents at issue are not mandated by board regulations). We have stressed that, to break through the medical peer review process, the moving party must show that the medical review process itself, and not the reasons for initiating it, was infected with lack of good faith. *Pardo* v. *General Hosp. Corp.*, *supra* at 12 ("The focus must be on the committee member's actions within *the peer review committee process itself*, not on possible discriminatory reasons for initiating a review of the plaintiff's work" [emphasis added]). Thus, Vranos's theory that the desire for vengeance motivated Skinner's initiation of the investigation, which the judge accepted, is irrelevant. Vranos has failed to point to any evidence of misconduct within the peer review process (which, in fact, resulted in the lifting of Vranos's summary suspension). See *Pardo* v. *General Hosp. Corp.*, *supra* at 12-13, quoting *Doe* v. *St. Joseph's Hosp. of Fort Wayne*, 42 Empl. Prac. Dec. (CCH) par. 36,973 (N.D. Ind. 1987) ("plaintiff must 'allege facts which create more than a mere inference that the actions of the peer

---

[18]Vranos argues that any insufficiency in evidence was remedied by an affidavit he submitted in response to FMC's motion for reconsideration. The affidavit was not included in the record before us, and is not specifically discussed in the brief denial of the motion to reconsider. In any event, we reject the argument that Vranos's affidavit provides ex post facto support for the judge's discovery order.

review committee were discriminatory, before the court will permit even an in camera inspection of the communications to, records of or determinations of the peer review committee' ").

Moreover, even if Vranos's speculations were sufficient to meet his burden, which they are not, the conclusions drawn by the judge are far from self-evident. The judge, for example, concluded that Skinner's initial investigation of the incident leading to Vranos's summary suspension was "inadequate and somewhat arbitrary" because, under FMC's bylaws, such a remedy (suspension) "seems to be intended" for "grave and immediate safety concerns."[19] In fact, FMC's bylaws submitted to the judge as part of Skinner's affidavit provide that summary suspension is appropriate "[t]o reduce the substantial likelihood of injury or damage to the health or safety of any patient, employee, or other person at [FMC]" and "[f]or the continued effective operation of [FMC]." It is also evident that summary suspension proceedings are necessarily conducted quickly and without the time for a thorough review of all evidence.[20] We do not consider indicative of lack of good faith that Skinner, as FMC's president, would act swiftly and decisively in response to a disruptive incident between two members of the FMC staff that had tremendous potential to disrupt the day-to-day operations of the entire institution.[21] Finally, we note that Vranos

---

[19]The judge properly held, and Vranos does not dispute, that Skinner "had the authority to issue a summary suspension in this case," where Vranos's conduct required immediate action to reduce the substantial likelihood of injury to an employee of FMC, or for its continued effective operation.

[20]Vranos argues, and the judge concluded, that FMC's policy on disruptive behavior states that a complaint about such behavior should first be brought to FMC's patient care coordinator for corrective action. However, its policy on medical staff disruptive behavior states: "Notwithstanding any provision of [the disruptive behavior] policy, one or more incidents of disruptive behavior by a Member may be grounds for corrective action or other disciplinary action under the procedures set forth in the FMC Medical Staff Bylaws. *Nothing in this policy is intended to preempt, interfere with, or otherwise affect the procedures for corrective action and other disciplinary action set forth in the FMC Medical Staff Bylaws*" (emphasis added).

[21]Skinner stated in his affidavit: "I did not make the decision to impose summary suspension against [Vranos] lightly. I understood that I had the option of imposing summary suspension or initiating a request for corrective action. After learning of the incident involving Vranos on the morning of October 28, I had to balance the competing needs of getting information and

knowingly declined to exercise his right to contest his temporary suspension to the trustees and cannot now rely on speculation to obtain information that might otherwise have been available to him.

The exceptions to the privilege urged by Vranos would decimate the efficacy of confidentiality protections in G. L. c. 111, § 204 (*a*), any time a plaintiff asserts an allegation of bad faith, which undoubtedly more plaintiffs would do if we accepted Vranos's argument. "It does not seem reasonable that the Legislature would create a [peer review committee] privilege and through an exception undercut the confidentiality that that privilege allows." *Beth Israel Hosp. Ass'n* v. *Board of Registration in Med.*, 401 Mass. 172, 182 (1987).

3. *Conclusion.* For the foregoing reasons, the judge's order is vacated, and the case is remanded for further proceedings consistent with our opinion.

*So ordered.*

---

addressing the situation expeditiously. I discussed the situation generally with seasoned health care professionals who deal regularly with medical staff issues. . . .

"I made a final decision that summary suspension was not only warranted, but necessary because [Vranos] accepted no responsibility whatsoever for his role in a troubling incident and because at least some cooling off period was required before I could comfortably allow him to work again in our Surgery Department . . . ."