WILLIAM VRANOS *vs.* MICHAEL D. SKINNER & others.[1]

No. 08-P-2006.

Franklin. November 5, 2009. - July 19, 2010.

Present: McHUGH, VUONO, & MEADE, JJ.

*Practice, Civil,* Motion to dismiss, Complaint. *Contract,* Performance and breach, Employment, Implied covenant of good faith and fair dealing, Interference with contractual relations. *Doctor,* Employment. *Hospital,* Peer review. *Civil Rights,* Coercion. *Libel and Slander.*

In a civil action brought by a plaintiff surgeon following the summary suspension of his staff privileges at a hospital, the judge correctly granted the defendants' motion to dismiss the plaintiff's claims of breach of contract and breach of the implied covenant of good faith and fair dealing, which were based on a theory that the hospital's bylaws and staff policy created a contract between the hospital and the plaintiff, where the plaintiff failed to comply with the provisions in the bylaws containing extensive review processes; where the plaintiff could not demonstrate that a course of conduct, oral representations, or other aspects of the plaintiff's tenure at the hospital somehow eroded the review process provisions; and where the plaintiff could not demonstrate that the provisions were facially invalid or that he was excused from complying with them. [287-290]

In a civil action brought by a plaintiff surgeon following the summary suspension of his staff privileges at a hospital, the judge correctly granted the defendants' motion to dismiss the plaintiff's claim alleging a violation of G. L. c. 12, § 11I, the Massachusetts Civil Rights Act, where the defendants' actions effected neither a surrender of the plaintiff's right to work nor his right to express opinions [290]; further, the judge correctly granted the defendants' motion to dismiss the plaintiff's claim of interference with contractual and advantageous relations, where the plaintiff's allegations that the defendants' activities "jeopardized" the plaintiff's existing or anticipated relationships were not sufficient to state a claim [290-291].

In a civil action brought by a plaintiff surgeon following the summary suspension of his staff privileges at a hospital, the judge did not err in granting summary judgment in favor of the defendants (the hospital, its president, and its director of surgical services) on the plaintiff's defamation claims, where, to the extent the claims were based on the content of the summary suspension letter issued by the president, such a document constituted a peer review document and, by virtue of G. L. c. 111, §§ 204(*a*) and 205(*b*), was inadmissible in any judicial proceeding and thus could not serve as a

---

[1]Kenneth Gaspard and Franklin Medical Center.

basis for a viable defamation claim [293-295]; further, the fact of the plaintiff's suspension, by itself, could not serve as the basis for a defamation claim, where the suspension was the result of the peer review process, which is statutorily immunized from judicial review [295-296]; finally, allegedly defamatory statements that the president made to hospital staff, when considered in context, added nothing to whatever defamatory sting flowed from the suspension itself [296-297].

CIVIL ACTION commenced in the Superior Court Department on March 3, 2005.

Following review by the Supreme Judicial Court, 448 Mass. 425 (2007), the case was heard by *Constance M. Sweeney*, J., on a motion for summary judgment.

*Thomas T. Merrigan (Peter M. Merrigan* with him) for the plaintiff.

*Francis D. Dibble, Jr.*, for the defendants.

McHUGH, J. After his staff privileges at Franklin Medical Center (FMC) were summarily suspended, Dr. William Vranos, an orthopedic surgeon, commenced this action against FMC, Michael D. Skinner, R.N., who is the FMC president, and Kenneth Gaspard, R.N., FMC's director of surgical and material services. Vranos's complaint contains six counts: defamation against Gaspard (Count I); defamation against Skinner and FMC (Count II); breach of contract by FMC (Count III); violation of the duty of good faith and fair dealing by FMC (Count IV); violation of G. L. c. 12, § 11I, the Massachusetts Civil Rights Act, against Skinner and FMC (Count V); and interference with contractual and advantageous relations by Skinner (Count VI).[2]

Early in the case, a judge of the Superior Court allowed the defendants' motion to dismiss all counts of the complaint save the two alleging defamation. Discovery followed and, among other things, produced a dispute regarding the application and impact of the peer review statute, G. L. c. 111, §§ 203-205. The

___

[2]This action is actually the successor to an earlier action Vranos filed against the same defendants. The defendants removed the case to United States District Court for the District of Massachusetts, apparently because the complaint contained allegations that the defendants' actions violated specified Federal statutes. Ultimately, Vranos dismissed the complaint voluntarily. He then refiled the case in Superior Court without the Federal claims.

Supreme Judicial Court resolved that dispute, see *Vranos* v. *Franklin Med. Center*, 448 Mass. 425 (2007), and discovery proceeded to a conclusion. The defendants then moved for summary judgment on the defamation counts. The same Superior Court judge allowed the motion, and the resulting judgment dismissed the entire case. Now Vranos appeals, seeking reinstatement of all counts except Count I, which asserted the defamation claim against Gaspard. We affirm, though for reasons that do not in all instances track those set out by the motion judge in her thoughtful memorandum of decision.

Because the complaint provides a context for all of the claims at issue on this appeal, we begin our review by examining the allegations it contains and the four claims dismissed for facial insufficiency. Then, using a different standard, we turn to the defamation claim and to the additional facts supplied by the affidavits and other materials the parties filed in connection with the summary judgment proceedings.

1. *The motion to dismiss (Counts III through VI).* a. *Facts.* Our initial approach to the complaint's allegations is a limited one. Counts III through VI were dismissed pursuant to Mass. R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), for failure to state a claim on which relief could be granted. Accordingly, in reviewing that dismissal, we are limited to facts alleged in the complaint itself and to the inferences reasonably drawn when those allegations are viewed in the light most favorable to the plaintiff. See, e.g., *Warner-Lambert Co.* v. *Execuquest Corp.*, 427 Mass. 46, 47 (1998); *Karty* v. *Mid-America Energy, Inc.*, 74 Mass. App. Ct. 25, 26 (2009).[3]

Read with that standard in mind, the complaint reveals that

---

[3]In moving for dismissal, the defendants filed and referred to a number of documents that were not part of the complaint. In ruling on the motion, however, the judge expressly declined to consider any document except appendix 3, § 2.0, of the FMC medical staff bylaws pertaining to summary suspension; the special notice of summary suspension; the recommendation of the medical staff summary suspension review committee; and FMC medical staff policy no. 5 entitled "Medical Staff Disruptive Behavior." Those four documents were cited in the complaint, were central to the plaintiff's claims, and were of undisputed authenticity. Vranos does not claim that the judge's consideration of those documents was improper, and we likewise consider them in our review. See, e.g., *Alternative Energy, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) ("When the complaint relies upon a docu-

Vranos, a board-certified orthopedic surgeon, had been on the FMC staff since July, 1996. From January, 2002, through November, 2004, he had been chief of the FMC department of surgery. Throughout that period, Vranos was also a partner in the Franklin Orthopedic Group, which is not affiliated with FMC. Both FMC and the Franklin Orthopedic Group are located in Greenfield.

For several months before the summary suspension at the heart of this case, Skinner tried to recruit Vranos to leave the Franklin Orthopedic Group and establish a competing practice at FMC. In late August, 2004, Vranos declined and, instead, accepted a position at Brattleboro Memorial Hospital, across the Vermont State line less than twenty miles north of Greenfield. The new position was effective January 1, 2005, and Skinner was concerned that Vranos's move would produce a loss of orthopedic surgical cases at FMC.

Vranos's year-end departure, however, was not the only event roiling the surgical services department at FMC in the fall of 2004. On October 19, forty-nine members of the department of surgery, including Vranos, signed a "Memorandum of Concern" relating to Gaspard and his assistant, Kim Cotter. The memorandum, copies of which were delivered to Skinner, Gaspard, and Cotter, focused on whether Gaspard and Cotter were fit to manage the FMC surgical department.

The specific events that led to this lawsuit began on October 28, 2004, when Vranos attended a regular meeting of the FMC surgical services support committee. The other three attendees were Dr. Henry K. Godek, chief of anesthesia, Gaspard, and Cotter. At the meeting, a heated disagreement between Vranos and Gaspard over a surgical services policy quickly ensued. Gaspard insisted that Vranos sign the policy and, when Vranos refused, Gaspard threatened to cancel all of Vranos's surgical cases for the day. The animated exchange lasted about five minutes, after which the meeting ended and Vranos returned to his medical responsibilities, performed surgeries, and interacted without incident with Gaspard and Cotter during the course of the day.

ment, whose authenticity is not challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss").

At some point shortly after the meeting, Gaspard reported to Skinner, falsely the complaint alleges, that Vranos had physically threatened and verbally abused him during the meeting and that Vranos had previously engaged in disruptive behavior and unprofessional conduct. Cotter also informed Skinner that Vranos had offended her on several occasions, though the complaint does not allege that those reports were false.

Late in the afternoon of October 29, 2004, Skinner delivered to Vranos a letter imposing a summary suspension on Vranos's medical staff membership and clinical privileges at FMC. In material part, the letter stated:

> "The grounds for this summary suspension are an incident that occurred on October 28, 2004, in the context of a history of disruptive behavior and unprofessional conduct by you at FMC. On October 28, 2004, in a meeting of the Operating Room Management Committee, you used intimidating, abusive, and hostile language and exhibited threatening behavior, including picking up a stack of papers and slamming them down on the table, picking up a chair and slamming it down in the conference room, and placing yourself physically close to one or more individuals while speaking in a loud, angry, and confrontational manner. Your behavior and conduct during this incident and at FMC has been perceived to be intimidating, abusive, hostile, and physically threatening.[4]"

The letter also described the appellate rights available to Vranos under the FMC bylaws.

Before issuing the letter, Skinner did not ask Vranos for his version of events, nor did he contact Godek to obtain his recollections and observations. The suspension, Vranos alleges, was issued in retaliation for his decision to move his practice to Vermont and his challenge of Gaspard and Cotter's management style.

Under an FMC bylaw provision, Vranos's summary suspension was automatically and quickly presented to the FMC medi-

---

[4]Initially, the papers in this case were impounded. In its opinion, the Supreme Judicial Court stated that the original basis for impoundment had disappeared during the course of judicial proceedings, and the impoundment order later was lifted. *Vranos* v. *Franklin Med. Center*, 448 Mass. at 425 n.1.

cal staff summary suspension review committee (review committee) on which Skinner served as one of four members. Ultimately, the committee recommended that the suspension be lifted on three conditions, one of which was that Vranos resign as FMC's chief of surgery.[5] That recommendation was promptly approved by the FMC board of trustees (trustees). Vranos alleges in his complaint that he was not "allowed to appear before and make a presentation to" the review committee or to the trustees. However, before issuing its decision, the review committee considered a written submission from Vranos, along with written submissions from Godek, other physicians who supported Vranos, and "documentation concerning prior incidents of disruptive behavior by [Vranos] at FMC."

All of the parties agree that the FMC medical staff bylaws (bylaws) and staff regulations apply, and, as the motion judge noted, these bylaws and regulations govern the summary suspension letter and the subsequent committee actions. Three segments of those documents are of particular importance to our review of the motion to dismiss. The first is appendix 3, part 2, § 2.1, of the bylaws. That section provides that a summary suspension may only be imposed

> "whenever the failure to take such action may result in an imminent danger to the life, health, or safety of an individual or otherwise whenever a practitioner's acts or conduct require that immediate action be taken:
>
>> "(a) To protect the life of any patient;
>>
>> "(b) To reduce the substantial likelihood of injury or damage to the health or safety of any patient, employee, or other person at the Medical Center; or
>>
>> "(c) For the continued effective operation of the Medical Center."

If those criteria are met, § 2.1 authorizes a number of FMC officials, including Skinner, to suspend summarily a physician's medical staff membership or clinical privileges or both. Within

---

[5]The other two conditions were that he apologize to Gaspard and Cotter and seek anger management counselling.

three business days following a summary suspension, however, a review committee must convene to review the summary suspension and advise the trustees "to continue, modify, or terminate the terms of the summary suspension." The review committee may also "recommend additional corrective action concerning the [physician], up to and including termination of the [physician's] Medical Staff membership or all or any portion of the [physician's] clinical privileges, or both."

Part 2 of the appendix is followed by additional parts dealing with such things as hearings after adverse action, procedures for the conduct of hearings, including the right to counsel, the right to call witnesses, the right to cross-examine adverse witnesses, and appellate review of adverse hearing results. The appendix ends with part 10, containing § 10.2, the second of the three provisions of particular importance. In material part, § 10.2 provides:

> "Whenever any adverse recommendation or [other] adverse action . . . is recommended or taken, the practitioner shall be entitled only to the remedies afforded by this Appendix 3, Corrective Actions and Fair Hearings, and shall exhaust such remedies. By requesting a hearing or appellate review under this Appendix 3, the practitioner agrees that any final action of the Board of Trustees following such hearing or appellate review shall be final and binding on the practitioner."

It is undisputed that the action taken by the trustees was "adverse action" within the meaning of § 10.2.

Finally, the third pertinent provision comes from FMC's medical staff policy on disruptive behavior, which requires that reports of disruptive behavior be documented in writing and submitted to the FMC patient care assessment coordinator for review, investigation, and any necessary corrective action. The affected staff member must be given notice of the report and an opportunity to respond, though the policy also states that it is not intended to preempt or interfere with other corrective action and disciplinary action described in the bylaws. The policy defines "disruptive behavior" broadly to include "[b]ehavior or conduct, whether verbal or physical, that has, or potentially may have, an adverse effect on the delivery of quality patient care,

or that disrupts, or has the potential to disrupt, FMC or Medical Staff operations."[6]

b. *Discussion.* In assessing the adequacy of a complaint, we read the complaint's allegations generously and in the plaintiff's favor. To withstand dismissal, the complaint's factual allegations, so read, "must be enough to raise a right to relief above the speculative level." *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 636 (2008), quoting from *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007). We therefore look to see whether there are in the complaint " 'allegations plausibly suggesting (not merely consistent with)' an entitlement to relief, in order to 'reflect[] the threshold requirement of [Mass.R.Civ.P.] 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." ' " *Ibid.*, quoting from *Bell Atl. Corp.* v. *Twombly, supra* at 557.

(i) *Counts III & IV — breach of contract & breach of the covenant of good faith and fair dealing.* The complaint alleges that the FMC bylaws and staff policy on disruptive behavior constitute a contract between FMC and Vranos. The complaint also alleges that the suspension and actions surrounding its issuance and removal breached the contract and one of its implied terms. The complaint does not allege, however, that Vranos availed himself of the extensive review processes the bylaws contain.[7] Unless compliance with those processes is somehow excused, that is an insurmountable problem, for our cases have established that "[w]here employment rights are contractual, and the contract establishes an internal grievance procedure for resolving disputes, the procedure ought to be followed." *Berkowitz* v. *President & Fellows of Harvard College*, 58 Mass. App. Ct. 262,

---

[6]Example of "disruptive behavior" identified in the guidelines included the following:

> "Verbal (or physical) assaults that are personal, irrelevant, rude, insulting, or otherwise inappropriate or unprofessional.

> "Inappropriate or unprofessional expressions of anger, destruction of property, or throwing items.

> "Hostile, angry, abusive, aggressive, or confrontational voice or body language."

[7]In fact, there is no real contest over the proposition that he did not, although his arguments and reasons for electing not to do so are discussed *infra*.

275 (2003) (tenure selection). Accord *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. 686, 696 (1996).

Although the contractual relationship between Vranos and FMC was not, strictly speaking, an "employment" relationship, the relationship governed Vranos's ability to perform surgery and otherwise treat patients at FMC, and it provided the basis for oversight, peer and other, of his interaction with patients. The peer review process, which formed an important part of that relationship, was driven by public policy and patient care considerations embodied in statutory mandates. See, e.g., G. L. c. 111, § 203.[8] See generally *Carr* v. *Howard*, 426 Mass. 514, 518 (1998); Mass. G. Evid. § 513 (2010). Consequently, the importance of complying with the contractual review processes is no less compelling in this case than it is when the contract covers the ordinary employer-employee relationship. See generally *Katz* v. *Children's Hosp. Corp.*, 33 Mass. App. Ct. 574 (1992). Indeed, because the review processes may have an impact on patient care even if patient care was not immediately affected by the conduct under review, compliance with the internal review processes is even more important than it is in the typical employer-employee relationship.

Vranos's arguments to the contrary are unpersuasive. His claim that "[t]he allegations [of the complaint] are sufficient to permit proof of an oral contract or a contract implied infact, and the evidence may show that the by-laws' limitations on the employees' privileges were not controlling," *Hobson* v. *McLean*

---

[8]In part, G. L. c. 111, § 203, as appearing in St. 1987, c. 332, provides:

"(a) The by-laws of every licensed . . . hospital and the by-laws of all medical staffs shall contain provisions for reporting conduct by a health care provider that indicates incompetency in his specialty or conduct that might be inconsistent with or harmful to good patient care or safety. Said by-laws shall direct a procedure for investigation, review and resolutions of such reports.

"(b) Whenever, following review by a medical peer review committee of a licensed . . . hospital determination is reached that a health care provider's privileges should be suspended in the best interests of patient care, such committee shall immediately forward the recommendation to the executive committee of the medical staff and the institution's board of trustees for action. A provider whose privileges are suspended shall be entitled to notice and a prompt hearing following suspension, in accordance with the institution's medical staff by-laws."

*Hosp. Corp.*, 402 Mass. 413, 416 (1988), is simply not borne out by the contents of the complaint even when read with the requisite indulgence. The complaint does not allege, nor does it plausibly point to, a course of conduct, oral representations, or other aspects of Vranos's tenure at FMC that somehow implicitly eroded the extensive and carefully constructed bylaws and other provisions he seeks to avoid, provisions driven by patient care concerns governing statutes embrace.

Next, Vranos's argument that the finality provisions of appendix 3, § 10.2, unfairly deprive him of all access to judicial review amounts to a facial attack on the elaborate hearing and appeal provisions appendix 3 contains. Like most such attacks, see, e.g., *O'Brien's Case*, 424 Mass. 16, 23-24 (1996); *Commonwealth* v. *Blair*, 60 Mass. App. Ct. 741, 749 n.15 (2004), Vranos's challenge necessarily and inappropriately assumes that the process will inevitably produce an unfair result. Neither a particular component of the review provisions nor the provisions as a whole describe a deck so stacked that unfairness is the likely outcome. On the contrary, the review process includes the right to counsel, the right to confront witnesses, the right to discovery, and other procedural devices that lie at the very heart of the judicial system. While the "Office of the [FMC] CEO" appoints the hearing panel, it must do so "after considering any recommendations of the President of the Medical Staff or of the Chair of the Board of Trustees," it must appoint an "impartial Hearing Officer," and any results the process produces must be approved by the trustees before they become effective. Beyond that, similar "finality" provisions are common ingredients of other nonjudicial mechanisms for grievance resolution, and those provisions have not eliminated the ability to obtain some judicial review of resulting decisions. See, e.g., *Acmat Corp.* v. *Daniel O'Connell's Sons, Inc.*, 17 Mass. App. Ct. 44, 49 (1983); *Katz* v. *Children's Hosp. Corp.*, 33 Mass. App. Ct. at 575. There is no reason to assume that an appropriate level of review would be unavailable here.

Finally, Vranos claims that he was excused from following the grievance procedures because Skinner failed to follow bylaw requirements before issuing the summary suspension and during the course of ensuing administrative reviews. But the decision

of the trustees upholding the conditions on which the review committee terminated the suspension was an "adverse action." When the trustees made their decision, therefore, Vranos was entitled to appeal and to use all of the procedures the bylaws contained to challenge any aspect of the process that led to the trustees' decision, including Skinner's alleged violation of by-law provisions. Consequently, Skinner's alleged failure to follow the provisions of the bylaws was a basis for invoking the bylaw's appellate review procedures, not grounds for ignoring them.

(ii) *Counts V & VI — violation of the Massachusetts Civil Rights Act and interference with contractual and advantageous relations.* Assessment of the other two counts dismissed pursuant to Mass.R.Civ.P. 12(b)(6) requires less discussion. To state a claim for violation of the Massachusetts Civil Rights Act, G. L. c. 12, § 11I, the complaint must contain factual allegations plausibly suggesting that the defendants (1) interfered with, or attempted to interfere with (2) the plaintiff's exercise or enjoyment of rights secured by the Constitution or laws of either of the United States or of the Commonwealth (3) by threats, intimidation, or coercion. See, e.g., *Brunelle* v. *Lynn Pub. Schs.*, 433 Mass. 179, 182 (2001). Vranos alleges in his brief that " 'the natural effect of the defendant's action[s] was to coerce,' *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 100 (1987), his resignation as Surgery Department Chair, to silence his opinions, and to infringe on his right to his occupation" (emphasis omitted). But Vranos does not point to any statutory or constitutional basis for his right to be "Surgery Department Chair" and, independently, we are aware of none. The requirement of apologies and anger management counselling "naturally effected" neither a surrender of Vranos's right to work nor his right to express opinions. Instead, the requirement simply imposed an obligation to conduct both activities in a civil manner.

In the interference count, the complaint alleged that "Skinner and FMC caused . . . advantageous relations and contracts with third parties, such as the patients of the plaintiff, his status as a member of FMC's medical staff, and his future employment with Brattleboro Memorial Hospital to be jeopardized" with resulting, but unspecified, economic damages. Under Massachusetts law, however, a viable claim for interference with a

contractual or advantageous relationship requires allegations "that the defendant knowingly and for an improper purpose or by improper means induced a party to breach a contract or not to enter into or continue a business relationship, resulting in damage." *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 652 (2003). See *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 787 (1989). Allegations that the defendant's activities "jeopardized" the plaintiff's existing or anticipated relationships are not enough.

2. *The motion for summary judgment (Counts I & II).* a. *Facts.* The remaining counts of the complaint alleged defamation and were resolved in the defendants' favor on a motion for summary judgment. As noted, Vranos appeals only from the dismissal of Count II, which alleges that Skinner, and FMC vicariously, defamed him by certain written statements in the notice of summary suspension and in oral statements Skinner made to the review committee, to the trustees and to other FMC staff.

The facts pertinent to our review of the summary judgment decision come not from the complaint but from the "pleadings, depositions, answers to interrogatories, and responses to requests for admission under Rule 36, together with the affidavits" filed by the parties in connection with the motion. Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002). We look at the factual content of those sources in the light most favorable to Vranos and, as before, draw all inferences in his favor. See, e.g., *Kitras* v. *Zoning Administrator of Aquinnah*, 453 Mass. 245, 251 (2009).

The specified sources verify many of the complaint's primary factual allegations. Skinner had tried and failed to recruit Vranos to leave the Franklin Orthopedic Group and establish a competing practice at FMC. Vranos had accepted a position at Brattleboro Memorial Hospital effective January 1, 2005. Vranos, Godek, Gaspard, and Cotter did attend a meeting on October 28, 2009. Shortly after the meeting, Gaspard did tell Skinner that Vranos had physically threatened and verbally abused him during the meeting and that Vranos had previously engaged in disruptive behavior and unprofessional conduct. Skinner arranged for others to meet with Gaspard and Cotter to assess their concerns and, after hearing from those individuals, issued, on October 29, the letter summarily suspending Vranos.

In addition, however, the summary judgment record provided further detail regarding the suspension and regarding postsuspension events. Specifically, Skinner sent the summary suspension letter to the president of the FMC medical staff, the FMC medical director, and the senior vice president for medical affairs for Baystate Health, a nonprofit healthcare company of which FMC is a subsidiary. All three recipients were, at the time, members of the FMC medical staff executive committee, a medical peer review committee at FMC whose general functions include oversight of the medical staff.

On November 3, 2004, the four members of the review committee, which included Skinner, reviewed the summary suspension. In the course of its review, the committee considered written submissions from Vranos, from Godek,[9] from other physicians supportive of Vranos, and from Gaspard, Cotter, and Skinner. The review committee issued a recommendation, authored by Skinner, which suggested that the suspension be terminated if Vranos agreed to three conditions: resigning as chief of surgery, apologizing to Gaspard and Cotter, and seeking anger management counselling. Vranos was notified of the recommendation by letter dated November 4, 2004, which also stated that the trustees would review the committee's findings at their November 9, 2004, meeting, and that Vranos could submit additional material for consideration by the trustees.

Vranos accepted and agreed to comply with the review committee's recommendations. Nevertheless, the trustees, in accordance with the bylaws, proceeded to consider the summary suspension, reviewing in the process all of the documents that had been submitted to the review committee, plus a letter from Vranos's counsel dated November 8, 2004; a letter from Vranos dated November 6, 2004; and a resolution dated November 8, 2004, in support of Vranos and signed by approximately forty-two FMC physicians. Following their review, the trustees voted to accept the recommendation of the review committee. Because Vranos had by then complied with the conditions the review

---

[9]In his submission, Godek said that both Gaspard and Vranos shouted at each other and stood toe to toe during the meeting but that Vranos slammed down a stack of x-rays and pushed a chair after Gaspard and Cotter had left the room.

committee had proposed, the summary suspension was terminated on November 9, 2004, the day the trustees met.

The trustees advised Vranos of the action they had taken and of his right to appeal in accordance with the procedures spelled out in appendix 3 of the bylaws. By letter dated December 6, 2004, to the chairman of the board of trustees, Vranos claimed that the appendix 3 procedures were insufficient and requested that the trustees create an ad hoc procedure to review the adverse action that had been taken against him. The trustees declined to create a new procedure and informed Vranos of their belief that the appendix 3 procedure was consistent with State and Federal law and entirely adequate.

Finally, Vranos was required to report the summary suspension to the Massachusetts Board of Registration in Medicine, the Vermont Board of Medical Practice, and to the President/ CEO and credentialing committee at Brattleboro Memorial Hospital. Vranos is also required to report the summary suspension whenever he applies for licensing in another State, seeks medical staff credentialing with a healthcare facility, or applies or reapplies for participation in health insurance programs.

b. *Discussion.* Against that backdrop, Vranos bases his defamation claim on (1) the content of the summary suspension letter, (2) the fact of the summary suspension, and (3) his assertion that Skinner, when responding to questions posed by members of the FMC staff about why he had suspended Vranos, responded by saying, in substance or effect, "you would understand if you knew what I know, but I cannot tell you."

The summary suspension letter, however, cannot serve as the basis for a viable defamation claim because it is a peer review document and, by virtue of G. L. 111, §§ 204(*a*), 205(*b*), is inadmissible in any judicial proceeding. See Mass. G. Evid. § 513(b). Our conclusion in that regard rests on the applicable statutes, the FMC bylaws, and the role the suspension letter played in the review process, a review process that is itself envisioned by the statutes and bylaws.

Dealing first with the statutes, G. L. c. 111, § 203(*a*), requires that hospital bylaws set out procedures for peer review proceedings. Section 203(*c*) immunizes from liability those who participate in the proceedings in good faith, and G. L. c. 111,

§ 204(a), inserted by St. 1986, c. 351, § 9, provides that "proceedings, reports and records of a medical peer review committee shall be confidential . . . [and] shall not be . . . introduced into evidence[] in any judicial . . . proceeding." The term "proceedings, reports and records" is broadly defined in G. L. c. 111, § 205(b), inserted by St. 1987, c. 579, § 3, to include "[i]nformation and records . . . which are necessary to the work product of medical peer review committees." See *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 398 (2005). See Mass. G. Evid. § 513(b)(2). In turn, a "medical peer review committee" includes "a committee of a . . . medical staff of a . . . licensed hospital . . . which committee has as its function . . . the determination of whether a health care provider's actions call into question such health care provider's fitness to provide health care services." G. L. c. 111, § 1, as appearing in St. 1987, c. 579, § 1.[10] See Mass. G. Evid. § 513(a)(2).

When the summary suspension letter is examined in that definitional matrix, its character as a peer review document becomes apparent.[11] Vranos agrees that the review committee is a peer review committee. The committee is required, among other things, to convene no later than three days after imposition of a summary suspension to "review and consider the terms of the summary suspension," and make recommendations to the trustees regarding those terms. As noted earlier, appendix 3, § 2.1, of the bylaws empowers a number of hospital officials to impose a summary suspension when "immediate action" is necessary, among other things, "for the continued effective operation of" FMC.

So viewed, the summary suspension letter Skinner issued to Vranos in this case was the initial step in a peer review process that, by definition, is designed to move forward swiftly in order to deal with an existing emergency. The terms of the suspension

---

[10]A similar definition appears in 243 Code Mass. Regs. § 3.02 (1994), which provides definitions applicable to regulations governing proceedings and powers of the Board of Registration in Medicine.

[11]The defendants, citing *Vranos* v. *Franklin Med. Center*, 448 Mass. at 436 n.16, argue that the Supreme Judicial Court decided in its earlier opinion in this case that the suspension letter was a peer review document and, thus, inadmissible. That is the way we, too, read the court's opinion, but to guard against the possibility that our reading is erroneous, our independent analysis proceeds.

and the reasons for it were critical ingredients of the review process. A document containing both the terms and the reasons for the suspension is, therefore, a document that is necessary for the review committee's effective operation. Indeed, it is difficult to imagine that the process could work effectively if the suspension's issuer, the recipient, and the review committee attempted to proceed solely on a series of oral reports or in the absence of a common foundational document containing the terms of the suspension and the basis for it. Because the letter was necessary for the review committee's effective operation, G. L. c. 111, §§ 204(*a*) and 205(*b*), prohibit its introduction in evidence and, thus, its use as the basis for a defamation claim.[12]

We are likewise unpersuaded that the fact of Vranos's suspension, by itself, can serve as the basis for a defamation claim. To be sure, there are occasions when a nonverbal act conveys to a reasonable observer negative implications about an individual sufficient to make the act itself defamatory, for defamation, broadly viewed, arises out of communications, not from the particular form the communications take. See, e.g., *Phelan* v. *May Dept. Stores Co.*, 443 Mass. 52, 57 (2004) ("defamatory publication *may* result from the physical actions of a defendant, in the absence of written or spoken communication"); Restatement (Second) of Torts §§ 559 comment a; 565 comment b; 568 comment d (1977). In this case, however, permitting a claim for defamation to proceed on the basis of defamatory implications that arose from Vranos's suspension would result in a trial without any evidence of the peer review documents, actions, and proceedings that explained why the suspension was issued,

---

[12]In addition to the statutes that bar use of peer review documents in judicial proceedings, G. L. c. 231, § 85N, inserted by St. 1972, c. 242, provides immunity for peer review participants from any "suit for damages as a result of his acts, omissions or proceedings undertaken or performed within the scope of his duties as such committee member, provided that he acts in good faith and in the reasonable belief that based on all of the facts the action or inaction on his part was warranted." Absence of "good faith" opens the door to liability only if the participant acts without good faith in connection with his or her participation in the peer review process itself as, for example, by failing to "provide the medical peer review committee with a full and honest disclosure of all of the relevant circumstances, [and seeking] to mislead the committee in some manner." *Pardo* v. *General Hosp. Corp.*, 446 Mass. 1, 11-12 (2006).

conditioned, reviewed, or removed. A trial of that sort, and the erratic results such a trial might well produce, is fundamentally antithetical to the purpose of the peer review statutes, for it would permit Vranos to challenge the defendants' actions without allowing the defendant to explain why they acted. We think, therefore, that defamatory implications flowing from a suspension produced by a process that is statutorily immunized from judicial review cannot form the basis for litigation of the very kind the statutes were designed to prohibit.

That leaves statements Skinner is alleged to have made to members of the FMC staff who queried him about his suspension of Vranos, statements to the effect that each inquisitor "would understand if you knew what I know, but I cannot tell you." The motion judge allowed the defendant's motion for summary judgment as to those statements on the view that they were not defamatory. In the present context, we agree.

"A statement is defamatory . . . if it discredits a person in the minds of any considerable and respectable class of the community." *Milgroom* v. *News Group Boston, Inc.*, 412 Mass. 9, 12 (1992). In deciding whether a statement is defamatory, both the context in which and the circumstances under which the statement was made are important considerations. Restatement (Second) of Torts § 563 comments d, e.

The record reveals that the three people who heard Skinner's statement were themselves physicians with privileges at FMC. They knew that Skinner had played a leading role in initial issuance of the summary suspension order, and they each professed familiarity with the bylaw provision governing summary suspensions. They each knew, therefore, that Skinner had a leading role in issuing an order that could be issued only when failure to do so might "result in an imminent danger to the life, health, or safety of an individual or otherwise whenever a practitioner's acts or conduct require that immediate action be taken: (a) To protect the life of any patient; (b) To reduce the substantial likelihood of injury or damage to the health or safety of any patient, employee, or other person at the Medical Center; or (c) For the continued effective operation of the Medical Center."

When the three physicians queried Skinner about his actions, he responded with the allegedly defamatory statement that they

would "understand" why he had suspended Vranos if they knew what he knew. But Skinner's statement was not a qualitative assessment of Vranos's conduct, for it did not suggest that an understanding of why Skinner had acted would lead to general agreement with his action or even that the inquiring physicians would agree. More important, if there was injury to Vranos's reputation, the injury inevitably flowed from the physicians' awareness of the summary suspension and the limited circumstances under which such a suspension could issue. In that context, Skinner's statement to the doctors added nothing to whatever defamatory sting flowed from the suspension itself. See *Howell* v. *Enterprise Pub. Co.*, 455 Mass. 641, 667 (2010).

*Judgment affirmed.*